THE STATE, DEFENDANT IN ERROR, v. FRANK BECTSA, PLAINTIFF IN ERROR.

Argued June 30, 1904—Decided September 30, 1904.

1. Two of the jurors regularly drawn from the general panel to serve on the special panel of forty-eight, served upon a defendant in a criminal case, were over sixty-five years of age. *Held,* that the special panel was not thereby vitiated; that the court had no power to substitute other jurors, and that the remedy given by the statute was to challenge for cause upon proof of the disqualification.
2. *Held,* also, that the statement, in the charge of the trial court, that "no circumstances were shown that would mitigate this crime from murder to manslaughter," was, in the connection in which it was employed and in view of the undisputed testimony to which it referred, a proper instruction to the jury.
3. Where an act, done with the intention of committing murder by a willful, deliberate and premeditated killing, results in the slaying of a different person from the one intended, the crime is murder in the first degree, under section 107. *Pamph. L.* 1898, *p.* 824.

---

On error to Morris Oyer and Terminer.

For the plaintiff in error, *Willard W. Cutler, John M. Mills* and *David F. Barkman.*

For the defendant in error, *Charles A. Rathbun.*

The opinion of the court was delivered by

GARRISON, J. When this indictment was moved, counsel for defendant objected to proceeding with the trial for a reason that appears in the following extract from the printed case certified to this court with this writ of error:

"The prosecutor moved the indictment.

"Defendant objects to proceeding with the trial of this cause at the present time, because the defendant has not been served with a panel of forty-eight names of men eligible for jury duty and thereby offers to prove that there are on the panel returned to try the defendant at least two men over the age of sixty-five years. And also because the sheriff has not drawn a panel of forty-eight men eligible for jury duty.

"The Court—Does the defendant assert that no panel of jurymen has been served upon him, or is the objection confined to the fact that the panel served contains the names of two jurymen who are over the age of sixty-five years?

"Mr. Mills—Our only point is that two of the forty-eight men whose names were served upon us and who are returned to try the defendant are above the age of sixty-five years.

"The Court—You may proceed with the proof of this allegation."

Two persons were thereupon called by the defendant and sworn, one of whom testified that he was on the general panel and was over sixty-five years of age, the other simply that he was sixty-six.

The defendant's objection was then overruled and an exception allowed. This ruling was clearly correct. The panel that had been served on the defendant had been regularly drawn from the general panel in conformity with the statute, which is the sole authority for the procedure. The fact that two of the forty-eight jurors so drawn were above the age of sixty-five did not vitiate the special panel. The statute does not say so, but on the contrary provides a remedy that is inconsistent with such a result. If it was the defendant's purpose to require the trial court to fill up the special panel

by the substitution of talesmen for the two jurors who were over age, no such request was made, and if it had been there was no power in the court to comply with it.    The argument upon this point addressed to this court evinced a misconception of the statute upon which this supposed authority was thought to rest, viz., *Pamph. L.* 1903, *p.* 250.    That statute applies to the general panel to be summoned by the sheriff and not to the special panel to be drawn therefrom and served on the defendant.

Even if we give to the defendant's objection the force of a challenge to the array, the result would have been the same. The statute that prescribes the qualifications of jurors provides what shall be the result of and the remedy for its infraction, viz., that upon proof of overage or of a juror's having served within three preceding terms he may be challenged for cause.    The court in administering a legislative procedure of this sort does not go beyond the prescription of the regulative statute.

The charge of the trial court in certain particulars and the refusal of the court to charge certain of the defendant's requests have been assigned as reasons that should lead to a reversal of the judgment.

The first of these to be noticed is the statement that occurs in the charge of the court that "no circumstances were shown that would mitigate this crime from murder to manslaughter," which may be conveniently considered in connection with the exception taken to the refusal of the court to charge at the request of the defendant, "If the shot was fired through a window without intent to take human life, and it does not appear that the probable consequence of the act was bloodshed, and a killing occurred, such killing would be manslaughter."

The following is the language of the trial court to the jury covering these points and disclosing incidentally the circumstances under which the homicide took place:

"You have heard the evidence concerning the shooting, and concerning the previous conduct of the defendant; you have

heard it testified that shortly before the occurrence the defendant had been put out of the house, leaving Minnie Root and her father and mother and John Kasiski and his wife and children, and the two Bachnyatkis in the room, and that while the defendant stood in the door yard, near the window, John Kasiski went to the window and drew aside the shade or curtain and looked out; that he saw Frank, the defendant, standing outside; that Kasiski told him, in substance, to go away and make no further trouble; and Kasiski says at that time the defendant had a revolver in his right hand, and the witness saw it, and the defendant fired the first shot through the window; that it was a bright moonlight night, and Kasiski, according to his evidence, saw the defendant aim the revolver. The first shot came through the lower pane of the upper sash of the window and struck a bottle and the frame of the sash, and that then a second shot was fired, the bullet passing through the upper pane of the lower sash and striking Minnie Root in the head.

"Now, if the defendant, while standing a few feet from the window of the room in which all these persons were known by him to be—eight or ten persons, if you believe the evidence—purposely fired a revolver at the window—the weapon carrying a thirty-two calibre bullet—with sufficient force to go through the glass and to penetrate the brain of a human being in the room, the firing of that shot constituted an unlawful act against the peace of this state, and if you find the probable consequence of that act was bloodshed—and, of course, if the bullet struck one of the occupants of the room, such would be its natural consequence—and that Minnie Root's death was caused by the bullet so fired, then, by force of the plain terms of the statute of this state, the homicide thus resulting is murder and not manslaughter."

From this excerpt from the judicial charge it appears both that the question of probable bloodshed was in fact left to the jury and also, upon the uncontroverted evidence as to the small size of the room, that the number of its occupants justified the trial court in excluding from the consideration

of the jury the question of manslaughter, and in its refusal to charge a request based upon the notion that under such circumstances a verdict of manslaughter could legitimately be found.

A further point, and one of much general interest urged for the reversal of this judgment, is that the court charged the jury that if they found that the death of Minnie Root resulted from a pistol shot intended by the defendant for another person, the question of the defendant's guilt and the *degree* of his guilt, if guilty, is to be determined precisely the same as if the bullet had killed the person for whom it was intended.

This the court charged, and rightly so. Such is the exact meaning of the statute of this state creating and defining the degrees of murder. The statute is in these words: "Murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in perpetrating, or attempting to perpetrate, any arson, burglary, rape, robbery or sodomy, shall be murder in the first degree; and all other kinds of murder shall be murder in the second degree." *Pamph. L.* 1898, *p.* 824, § 107.

In this statute the two concrete cases of murder in the first degree and the general description of the cognate class that immediately follows are all based upon the existence of a certain condition of mind in the perpetrator of the murder, which, as to the concrete instances, is described by reference to the means employed or the method adopted, viz., by poison or by lying in wait, and as to the general class that follows, by the use of descriptive words of which the two concrete cases are something more than apt illustrations, being, by force of the word "other," criteria controlling the sense in which the more general terms are employed. It is clear, therefore, that murder, whether resulting under the special circumstances first detailed or evincing the state of mind afterwards described, is murder in the first degree without regard to any extraneous consideration, and that the determining element

in either case is the existence of the reprobated state of mind in the murderer and not the measure of success that attended its accomplishment. So that if A administer poison to murder B, which is fatally drunk by C, A's crime is murder in the first degree. So likewise, if A, lying in wait to murder B, or intending his murder in the state of mind described by the statute, chance to kill C, equally and in either case A's crime is murder in the first degree. This is the plain meaning of the statute consistent with its entire spirit, interpreted by its own illustrations and sustained by the analogy it bears to the imputable quality at common law of the malice that is essential to the crime of murder.

There are other reasons for reversal based upon the admission and rejection of testimony and upon certain definitions given in the judicial charge. These have been examined with care to see if any error prejudicial to the defendant had been committed. We have found in the record that has been certified to us no such error; the judgment rendered by the Court of Oyer and Terminer is therefore affirmed.

*For affirmance*—The CHANCELLOR, DIXON, GARRISON, FORT, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY. 9.

*For reversal*—None.