STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. CARL E. WORLOCK, DEFENDANT–APPELLANT.

Argued September 26, 1989—Decided February 22, 1990.

*Robert M. Schaaf,* Designated Counsel, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue in this case concerns the adequacy of the jury charge on the defense of insanity, which the Appellate Division sustained in an unreported opinion. We granted certification, 113 *N.J.* 343 (1988), and likewise find the charge to be sufficient. Finding no merit in defendant's other contentions, we affirm his convictions for murder and for possession of a weapon for an unlawful purpose.

I

The following summary is substantially consistent with defendant's version of the facts. Defendant, Carlyle Worlock, and his two victims, Guy Abrahamsen and Shawn Marchyshyn, had an unstable friendship in which Abrahamsen would periodically subject defendant to ridicule and physical abuse. On the night before the killing, the three young men went from Jackson Township to Seaside Heights, where, at defendant's expense, they spent the night smoking marijuana, drinking beer, and "partying" with two women "picked up" by Abrahamsen and Marchyshyn. After returning to Marchyshyn's apartment the following morning, Abrahamsen asked defendant for his pants. The ostensible reason for the request was that defendant's pants were dirty and Abrahamsen wanted to launder them. Apparently, however, the request was a ruse to obtain defendant's wallet, which contained, among other things, approximately $130 and a photograph of defendant dressed in a sadomasochistic costume at a gay parade in Hollywood. Defendant viewed the theft of his wallet as an act of betrayal, and feared that Abrahamsen could "destroy" him by disclosing the photograph.

"Burning and angry," defendant retrieved a semi-automatic .22 caliber rifle that he had hidden in a nearby wooded area because of a premonition that Abrahamsen "would do something like this." He test-fired the rifle, from which the stock was missing, and began "fuming about what had been done to

him." While brooding, he decided to "let this guy [Abraham-sen] have it." Defendant proceeded to the vicinity of Marchy-syn's apartment, where he waited for the victims.

Shortly thereafter, defendant saw Abrahamsen and Mar-chyshyn exit from a taxi cab. He knew that neither of them had any money, so the sight of the cab confirmed the suspicion that Abrahamsen had taken his money. According to a defense psychiatrist, defendant was "devastated" by the realization that Abrahamsen had stolen his wallet. Concealing the rifle in a cloth, defendant moved to the far side of the building and "wait[ed] in ambush." As they approached, he moved to within fifteen feet of them and quickly fired twelve rounds.

As defendant testified, "I aimed at Guy, and I * * * hit Shawn." The first bullet struck Marchyshyn in the chest and killed him. Three other bullets hit Abrahamsen, one in each arm and one in the back. Defendant fired a second burst of bullets, hitting Abrahamsen with six more shots as he opened the screen door of a ground-floor apartment. According to the occupants of the apartment, Abrahamsen stumbled into the family room and collapsed on the floor.

Defendant stated that he then tried to "divorce [himself] from the act," ran into the woods, changed his clothes, and went to a pizza parlor. While eating pizza, he saw several police officers "scouting" around, and he asked "what's happen-ing?". Defendant testified that he then walked to the home of Abrahamsen's girlfriend, and told her that he had shot Abra-hamsen. According to her, however, defendant said only that Abrahamsen had been shot. She left with two of her friends, one of whom called the police.

Defendant next went to his parents' house. They told him that the police were looking for him. On leaving the house, defendant noticed a police car parked nearby, and decided to "give himself in." After defendant identified himself, Officer Barry Wohl handcuffed him, read him his *Miranda* rights, and

told him that he was wanted "as a material witness involving an investigation."

At police headquarters, defendant again received *Miranda* warnings, signed a consent-to-questioning form, and confessed to shooting Abrahamsen and Marchyshyn. Defendant explained, however, that the shooting of Marchyshyn was an accident, stating that "Shawn got in the way."

On September 21, 1983, an Ocean County Grand Jury indicted defendant for the capital murder of Abrahamsen and Marchyshyn, in violation of *N.J.S.A.* 2C:11-3, and for the unlawful possession of a weapon, in violation of *N.J.S.A.* 2C:39-4a.

At trial, the principal issue was whether defendant was legally insane when he shot Abrahamsen and Marchyshyn.

## II

### A

The test for criminal insanity is set forth in *N.J.S.A.* 2C:4-1, which provides:

> A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Insanity is an affirmative defense which must be proved by a preponderance of the evidence.

Under the statute, as at common law, *see State v. Cordasco*, 2 *N.J.* 189, 196 (1949) (quoting *State v. Molnar*, 133 *N.J.L.* 327 (E. & A.1945)), a defendant is presumed sane and bears the burden of proving insanity as an affirmative defense. Underlying that presumption is the belief that people are capable of choosing between right and wrong. *State v. Sikora*, 44 *N.J.* 453, 470 (1965). A defendant who lacks that capacity is excused from criminal responsibility, but is subject to institutionalization as long as he is a danger to himself or others. *N.J.S.A.* 2C:4-8.

The insanity defense is consistent with the fundamental purpose of the criminal law as a means of protecting public safety. For a defendant who can choose between right and wrong,

criminal sanctions serve as punishment for him or her and as a deterrent to others. If the defendant cannot understand the wrongfulness of his or her conduct, he or she will not understand the reason for the punishment, and that punishment will not serve as a deterrent to anyone. From that perspective, an insane defendant is neither responsible nor blameworthy. *See Holloway v. United States*, 148 *F*.2d 665, 666–67 (D.C.Cir.1945), *cert. denied*, 334 *U.S.* 852, 68 *S.Ct.* 1507, 92 *L.Ed.* 1774 (1948); A. Goldstein, *The Insanity Defense* 8–11 (1967) (Goldstein); *American Psychiatric Association Statement on the Insanity Defense*, 140 *Am.J.Psychiatry* 681, 683 (1983) (*APA Statement*). Consequently, punishment for such a defendant would be both unjust and futile. II *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* § 2C:4–1 commentary at 96 (1971) (quoting *Model Penal Code* (Tent.Draft No. 4 at 156) (1955)). The insanity defense, therefore, serves to distinguish those who should be punished from those who lack sufficient capacity to merit punishment. In brief, the insanity defense separates "the sick from the bad." *State v. Maik*, 60 *N.J.* 203, 213 (1972), *overruled in part on other grounds, State v. Krol*, 68 *N.J.* 236 (1975); *Sikora, supra,* 44 *N.J.* at 475; Goldstein, *supra,* at 9.

As a legal standard for determining criminal responsibility, the insanity defense draws on principles of moral blameworthiness. To this extent, the defense ultimately depends on societal values. *See Leland v. Oregon*, 343 *U.S.* 790, 801, 72 *S.Ct.* 1002, 1008, 96 *L.Ed.* 1302, 1310 (1952); *Sauer v. United States*, 241 *F*.2d 640, 648–49 (9th Cir.), *cert. denied*, 354 *U.S.* 940, 77 *S.Ct.* 1405, 1 *L.Ed.*2d 1539 (1957); Goldstein, *supra,* at 89.

The insanity test codified in *N.J.S.A.* 2C:4–1 traces its origins to the rules set forth in *M'Naghten's Case*, 8 *Eng.Rep.* 718 (H.L.1843). There Daniel M'Naghten shot and killed Edward Drummond, secretary to Robert Peel, the Prime Minister of England. M'Naghten was charged with murder, and the jury returned a verdict of not guilty by reason of insanity. In responding to the ensuing public outcry, the House of Lords posed to its

Law Lords five abstract questions concerning the defense of insanity. In a combined answer to the second and third questions, Chief Justice Tindal stated that

> to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.
>
> [*Id.* at 722.]

Directed at the defendant's ability to "know," the *M'Naghten* test is essentially one of cognitive impairment. Sometimes described as the "right and wrong" test, its purpose is to determine whether the defendant had sufficient mental capacity to understand what he was doing when he committed the crime. *See APA Statement, supra,* at 682; Goldstein, *supra,* at 9.

With the advance of modern psychiatry, some critics, viewing the *M'Naghten* Rule as too restrictive, have suggested alternative tests of legal insanity. One alternative, sometimes described as the New Hampshire or *Durham* test, would excuse the defendant for an act that was a "product of mental disease." *State v. Jones,* 50 *N.H.* 369 (1871). Originally promulgated by the New Hampshire Supreme Court in the last century, the test attracted attention in the 1950s and 1960s when it was adopted by the United States Court of Appeals for the District of Columbia. *See Durham v. United States,* 214 *F.*2d 862 (D.C.Cir.1954), *overruled, United States v. Brawner,* 471 *F.*2d 969 (D.C.Cir.1972). Another alternative, the "irresistible impulse" test, focuses on volitional, rather than cognitive, impairment. It attempts to determine whether a defendant, due to mental illness, lacked the ability to control his criminal impulses. *See Smith v. United States,* 36 *F.*2d 548 (D.C.Cir. 1929). Yet another proposal argues that insanity should not relate to guilt, but to the disposition of the offender after conviction. *See State v. Lucas,* 30 *N.J.* 37, 82 (1959) (Weintraub, C.J., concurring); Weintraub, *Criminal Responsibility: Psychiatry Alone Cannot Determine It,* 49 *A.B.A.J.* 1075 (1963).

The most successful alternative, one that combines elements of the *M'Naghten* and irresistible-impulse tests, is contained in section 4.01 of the *Model Penal Code and Commentaries* (1985) (*Model Penal Code*). That section provides:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

By 1980, the *Model Penal Code* test had been accepted in more than half the states and in most federal circuits. See *Model Penal Code and Commentaries* § 4.01 at 175–76.

Notwithstanding those alternative formulations, New Jersey has consistently followed the *M'Naghten* Rule from its inception. *See State v. Spencer*, 21 *N.J.L.* 196, 204 (Oyer and Terminer 1846). The Rule has endured despite efforts to introduce the *Durham* test, *Maik, supra*, 60 *N.J.* at 212–13, and the irresistible-impulse test, *Cordasco*, 2 *N.J.* at 196; *Mackin v. State*, 59 *N.J.L.* 495, 496–97 (E. & A. 1896).

The *M'Naghten* Rule likewise survived a challenge from the New Jersey Criminal Law Revision Commission (New Jersey Commission) in the adoption of the current Penal Code. Originally, the New Jersey Commission recommended adopting the *Model Penal Code* test. *See* I *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* § 2C:4–1 (1971). Accepting the position of the Department of Law and Public Safety, Division of Criminal Justice, Appellate Section, *Report on the Proposed Penal Code* (1972) (unpublished), however, the Legislature retained the *M'Naghten* Rule.

More recently, the *M'Naghten* Rule has attracted other supporters. For example, the American Psychiatric Association (APA) states that

> [m]any psychiatrists * * * believe that psychiatric information relevant to determining whether a defendant understood the nature of his act, and whether he appreciated its wrongfulness, is more reliable and has a stronger scientific basis than, for example, does psychiatric information relevant to whether a defendant was able to control his behavior.

One leading authority has proposed a more modern formulation, which is "drawn from the Model Penal Code, [and] uses clinically meaningful terms to ask the same question posed by the House of Lords in *M'Naghten.*" Bonnie, *The Moral Basis of the Insanity Defense,* 69 *A.B.A.J.* 194, 197 (1983) (Bonnie). Professor Bonnie proposes that a person charged with a criminal offense shall be found not guilty by reason of insanity on proof that as a result of mental disease, he or she "was unable to appreciate the wrongfulness" of his or her conduct at the time of the offense. *Id.* at 197. In offering that proposal, Professor Bonnie adopted the *Model Penal Code* suggestion of substituting "appreciate" for "know." Professor Bonnie's proposal formed the basis for "[t]he standard of mental nonresponsibility [insanity]" approved by the American Bar Association. *ABA Criminal Justice Mental Health Standards,* Standard 7–6.1 at 335 n. 29 (1989). The American Bar Association Standard states that "[a] person is not responsible for criminal conduct if, at the time of such conduct, and as a result of mental disease or defect, that person was unable to appreciate the wrongfulness of such conduct."

A similar test, also substituting "appreciate" for "know," is incorporated in the Insanity Defense Reform Act of 1984 (codified at 18 *U.S.C.* § 17):

(a) Affirmative defense. It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

The difference between "know" and "appreciate" may be more apparent than real, but the latter word is more in tune with current psychiatric thinking. "Appreciate" introduces an "affective, more emotional, more personalized approach for evaluating the nature of a defendant's knowledge or understanding." *APA Statement, supra,* at 682; *ABA Criminal Justice Mental Health Standards, supra,* at 343–44; Bonnie, *supra,* at 197. Substituting "appreciate" for "know," however,

may not necessarily cause a "more comprehensive view of human behavior and thinking * * *." *APA Statement, supra,* at 684. As the *APA Statement* concludes, "[o]f much greater practical significance is whether the standard employed is interpreted by individual trial judges to permit or not to permit psychiatric testimony concerning the broad range of mental functioning of possible relevance for a jury's deliberation." *Ibid.*

The insanity defense is a legal standard incorporating moral considerations often established by medical testimony. Notwithstanding advances in psychiatry, mental states remain inscrutable, especially when an abnormal state is in issue. Generally, the determination of a defendant's ability to distinguish between right and wrong depends on psychiatric testimony. Such testimony provides insight into a defendant's mental condition and enables the fact-finder to differentiate defendants who can choose between right and wrong from those who cannot. Ultimately, the insanity defense requires satisfaction of a legal, not a medical, standard. As applied, the "right and wrong" test blends legal, medical, and ethical concepts. Perhaps for this reason, courts have generally admitted any credible medical testimony on the insanity defense. *Maik, supra,* 60 *N.J.* at 209. Consistent with that approach, we perceive no reason to construe "know" more restrictively than "appreciate."

### B

Defendant urges that the trial court committed plain error by failing to charge expressly that "wrong" as used in *N.J.S.A.* 2C:4–1 includes moral wrong. Although other jurisdictions have considered the issue, it is one of first impression in this state.

The issue harks back to an ambiguity in the first question posed by the House of Lords in the *M'Naghten* case:

What is the law respecting alleged crimes committed by persons afflicted with insane delusion in respect of one or more particular subjects or persons: as, for instance where at the time of the commission of the alleged crime the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some supposed public benefit?

[8 *Eng.Rep.* at 722.]

In reply, Chief Justice Tindal stated that

assuming * * * the inquir[y is] confined to those persons who labour under such partial delusions only, and are not in other respects insane, we are of the opinion that * * * he is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law; by which expression we understand your Lordships to mean the law of the land.

[*Ibid.*]

Without more, that reply would suggest that "wrong" means legal, not moral, wrong.

In addition to his previously-quoted answer to the second and third questions posed by the House of Lords, *supra* at 603, however, the Chief Justice explained that "[i]f the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable." *Id.* at 723. This elaboration suggests that "wrong" means both moral and legal wrong, an apparent conflict with the answer to the first question. The confusion is compounded because "wrong" is undefined in the opinion. At trial, moreover, the court charged the jury that M'Naghten was entitled to an acquittal if, at the time he shot Drummond, he did not know "that he was violating the laws both of God and man," *id.* at 719–20, thereby suggesting that "wrong" meant both legal and moral wrong.

Time has not resolved the ambiguity. Although a subsequent English decision has interpreted "wrong" to mean legal wrong, *Regina v. Windle*, 2 *Q.B.* 826 (1952), the High Court of Australia, which purports to follow *M'Naghten*, has decided that "wrong" includes moral wrong. *Stapleton v. The Queen*, 86 *C.L.R.* 358 (Austl.1952). The Model Penal Code proposed both alternatives, leaving to each state the determination

whether to use "wrongfulness" or "criminality" in the insanity test. *Model Penal Code* § 4.01.

Throughout the country, states have divided on the issue. Several states hold that a defendant is sane if he knows that his conduct is unlawful. *See State v. Hamann,* 285 *N.W.*2d 180, 183 (Iowa 1979); *State v. Boan,* 235 *Kan.* 800, 810, 686 *P.*2d 160, 168 (1984); *State v. Crenshaw,* 98 *Wash.*2d 789, 796, 659 *P.*2d 488, 493 (1983). The supporting rationale is that a standard based on morality would be too amorphous to be useful and that "[u]ntil a moral standard becomes law it is an unreliable test for sanity." *Hamann, supra,* 285 *N.W.*2d at 184. Because murder contravenes all legal and moral standards, moreover, "[t]here is no practical distinction between moral and legal right or wrong in a murder case." *Id.* at 183.

Other jurisdictions hold that "wrong" encompasses both legal and moral wrong. In these jurisdictions, defendants must prove that they were incapable of knowing that their acts were both morally and legally wrong. *See State v. Skaggs,* 120 *Ariz.* 467, 472, 586 *P.*2d 1279, 1284 (1978) ("wrong" does not mean "moral" wrong only); *People v. Skinner,* 39 *Cal.*3d 765, 783, 704 *P.*2d 752, 764, 217 *Cal.Rptr.* 685, 697 (1985); *People v. Wood,* 12 *N.Y.*2d 69, 76, 187 *N.E.*2d 116, 121, 236 *N.Y.S.*2d 44, 50 (1962). The only generally-recognized instance in which a "moral" wrong standard has provided an insanity defense is when the defendant has killed under the delusion that he or she was acting pursuant to a "command from God." *See People v. Schmidt,* 216 *N.Y.* 324, 110 *N.E.* 945 (1915); *see also State v. DiPaolo,* 34 *N.J.* 279, 292–93 (discussing *Schmidt* ), *cert. denied,* 368 *U.S.* 880, 82 *S.Ct.* 130, 7 *L.Ed.*2d 80 (1961); *Skinner, supra,* 39 *Cal.*3d at 783–84, 704 *P.*2d at 764, 217 *Cal.Rptr.* at 697 (same).

In *Schmidt,* Judge Cardozo stated that juries generally should be allowed to consider whether a defendant who claimed that he acted on a command from God was capable of perceiv-

ing that his act was morally wrong. 216 *N.Y.* at 339, 110 *N.E.* at 949. As Judge Cardozo explained:

> A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of her act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong. * * * We find nothing either in the history of the [*M'Naghten*] rule, or in its reason or purpose, or in judicial exposition of its meaning, to justify a conclusion so abhorrent.
>
> [*Ibid.*]

Finding that it was not error to leave "wrong" undefined, *id.* at 337, 110 *N.E.* at 949, the court stated that "there are times and circumstances in which the word 'wrong,' as used in the statutory test of responsibility, ought not to be limited to legal wrong." *Id.* at 339, 110 *N.E.* at 949. A more recent Arizona case, recognizing that "wrong" encompasses both legal and moral wrong, rejected the converse proposition that wrong should encompass "only a moral wrong." *Skaggs, supra,* 120 *Ariz.* at 472, 586 *P.*2d at 1284.

Long-standing New Jersey law also supports the premise that a defendant's ability to appreciate society's morals may be relevant to the determination of his sanity. In *Spencer, supra,* the trial court instructed the jury that

> if it is your opinion that at the time of committing the act [the defendant] was unconscious that he ought not to do it, or in other words, incapable of distinguishing right from wrong, *in a moral point of view,* then you have nothing further to do, but to render a verdict of acquittal on the score of insanity.
>
> [21 *N.J.L.* at 201.]

Similarly, in *State v. Carrigan,* the former New Jersey Supreme Court held that " 'where insanity is set up as a defense to an indictment for murder, unless it appears that the prisoner was not conscious, at the time of the killing, that the act which he was doing was morally wrong, he is responsible * * *.' " 93 *N.J.L.* 268, 273 (1919) (quoting a headnote in *Genz v. State,* 59 *N.J.L.* 488 (E. & A.1896)).

It may distort the analysis, however, to focus on whether the wrong was legal or moral. In the vast majority of cases, if the

defendant was capable of understanding that he was acting contrary to law, he would also have sufficient capacity to understand that he was acting contrary to the morals of society. Law is largely the crystallization of societal morals. Rarely would an allegedly illegal act not also be wrongful morally. Thus, "wrong" as used in the insanity defense will generally incorporate notions of both legal and moral wrong.

The "right and wrong" test does not focus on the actual knowledge of the defendant, but rather on his ability to perceive the wrongfulness of his conduct. Under the test, a defendant is excused from criminal liability if at the time of the commission of the offense, he or she lacked the capacity to distinguish right from wrong. *Cordasco, supra,* 2 *N.J.* at 196 (quoting *Molnar, supra,* 133 *N.J.L.* at 331). Only that defendant whose mind is impaired to the extent that he or she lacks the ability to comprehend that his or her conduct is wrong may successfully invoke the insanity defense.

Because the insanity inquiry focuses on the defendant's ability to comprehend whether his or her actions would ordinarily be disapproved by society, the concept of moral wrong must be judged by societal standards, not the personal standard of the individual defendant. *People v. Stress,* 205 *Cal.App.*3d 1259, 1274, 252 *Cal.Rptr.* 913, 923 (1988); *Hamann, supra,* 285 *N.W.*2d at 183; *Wood, supra,* 12 *N.Y.*2d at 76, 187 *N.E.*2d at 121, 236 *N.Y.S.*2d at 50; *Crenshaw, supra,* 98 *Wash.*2d at 796, 659 *P.*2d at 493. As a general rule, it will not be sufficient, therefore, that a defendant's personal moral code justified a killing otherwise prohibited by law and societal morals.

In most instances, legal wrong is coextensive with moral wrong. *Accord Stress, supra,* 205 *Cal.App.*3d at 1275, 252 *Cal.Rptr.* at 923; *Schmidt, supra,* 216 *N.Y.* at 340, 110 *N.E.* at 949; *Crenshaw, supra,* 98 *Wash.*2d at 797, 659 *P.*2d at 493–94; *see also Model Penal Code and Commentaries* § 4.01, comment at 169 ("Given the seriousness of most crimes for which the defense of insanity is interposed, a defendant who appreci-

ates society's moral disapproval of his conduct will almost always assume that the conduct is criminal conduct, and vice versa."); Goldstein, *supra*, at 52 ("most cases involving the insanity defense will involve crimes sufficiently serious to make society's moral judgment identical with the legal standard"). The clearest illustration of an act that is both a legal and moral wrong is murder. *Accord Hamann, supra*, 285 N.W.2d at 183. Thus, the distinction between legal and moral wrong generally need not be critical in a murder prosecution.

Occasionally, however, the distinction between moral and legal wrong may be critical. For example, if the defendant contends that he or she knowingly killed another in obedience to a command from God, a jury could find that the defendant was insane. *Schmidt, supra*, 216 N.Y. at 340, 110 N.E. at 949; *see also DiPaolo, supra*, 34 N.J. at 291–93 ("The experts disagreed upon whether there was evidence of a psychosis to support the alleged delusion, but none suggested that if defendant in fact suffered an insane delusion that God commanded the deed, he nonetheless was legally sane if he simultaneously appreciated that the deed was contrary to law. Nor did the trial court so intimate."). Although a "command from God" is the only generally-recognized exception, other delusion-based exceptions conceivably might arise. For the purposes of this opinion, however, we need not attempt to identify any such other exception. As we explain more fully below, *infra* at 612–614, defendant sought to justify the killings not by recourse to societal morals, but to his personal moral code.

■ Because an act that is contrary to law will generally contravene societal morals, a defendant who claims that he or she lacked the capacity to comprehend either legal or moral wrong need not receive a charge distinguishing the two kinds of wrong. In the exceptional case, such as the deific exception in which the defendant claims that he or she acted under a command from God, the court should instruct the jury that "wrong" encompasses both legal and moral wrong.

### III

The critical question here is whether the trial court should have expressly defined "wrong" to include moral wrong. When charging on insanity, the court made some preliminary comments and read *N.J.S.A.* 2C:4-1 to the jury. The critical part of the charge stated:

> If at the time of committing the act, the defendant was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing or if he did know it, that he did not know what he was doing was wrong, then he was legally insane and, therefore, not criminally responsible for his conduct.

> \*    \*    \*    \*    \*    \*    \*    \*

> If, at the time of the offenses, he had the mental capacity to distinguish right and wrong and to understand the nature and quality of the act done by him, he is subject to the criminal law.

> \*    \*    \*    \*    \*    \*    \*    \*

> The question is not whether the defendant, when he engaged in the deed, in fact, actually thought or considered whether the act was right or wrong, but whether he had sufficient mind and understanding to have enabled him to comprehend that it was wrong if he had used his faculties for that purpose.

As the Appellate Division noted, experienced trial counsel did not object to the court's failure to define "wrong." Hence, the issue is raised as plain error. See *R.* 2:10-2. Without discussing "whether 'wrong' encompasses both legal or moral wrong or only legal wrong," the Appellate Division found "no need to attempt to further define the concept of wrong to the jury since that abstract term is one within common knowledge."

Defendant, however, contends that the trial court committed plain error by not telling the jury that "wrong" encompasses both legal and moral wrong. According to defendant, that omission misled the jury because Dr. Robert Sadoff, a psychiatric expert for the prosecution, testified that defendant was sane, and therefore knew the killings were unlawful. On direct examination, Dr. Sadoff testified:

> A.  My opinion, number one, is that Mr. Worlock did not have a defect of reason. He does not have a disease of the mind. He has personality disorders which are not mental illnesses or diseases of the mind.

Secondly, that he did know the nature and quality of his act, and he did know what he was doing was wrong.

\* . \* \* \* \* \* \* \*

Q. What is the difference, Doctor, between feeling justified and knowing the difference between right and wrong?

A. The difference is that a person may believe that he is doing something right for him at a particular time, while at the same time he knows that it is wrong in that it is frowned upon and prohibited by society and that there is a law against such behavior. Despite that knowledge, he may still believe in his own mind that what he is doing is justified. The difference is, in terms of belief and knowledge, he knew but he believed that it was right for him.

Defendant asserts Dr. Sadoff's testimony is tantamount to the instruction of an "erroneous legal theory to the jury." The testimony is erroneous, according to defendant, because it misled the jury to believe that defendant was sane if he appreciated that the killings were against the law. Because the jury received an erroneous impression of the law, the argument continues, the court "committed plain error by failing to disabuse the jury of [Dr. Sadoff's] error, either at the time of the testimony, or during the charge to the jury." We see several flaws in the argument.

First, Dr. Sadoff's testimony does not include an "erroneous legal theory." "Wrongfulness" in the insanity defense takes account of both legal and moral wrong. Dr. Sadoff's testimony addresses both concepts. His statement that a defendant's act may be "frowned upon and prohibited by society," when contrasted with the immediately-following statement "and there is a law against such behavior," conveys both moral and legal considerations. Thus, we find no merit in defendant's claim that, in light of Dr. Sadoff's testimony, the trial court committed plain error in failing to define "wrong" for the jury.

Second, the record does not support defendant's claim that the trial court should have instructed the jury that "wrong" includes both legal and moral wrong. Such an instruction is necessary only if the distinction is critical to the facts on which a defendant bases the insanity defense. Here, defendant claims not that he killed Abrahamsen and Marchysh-

yn because the killings comported with societal morals, but because he was "infuriated" that they had stolen his wallet. He did not kill the victims because of his inability to distinguish "right" from "wrong." He killed them because he "hated" Abrahamsen and Marchyshyn "got in the way." Defendant openly admitted at trial that at the time he killed the victims, he knew his acts were illegal and that they were wrong under societal morals. On this record, we cannot fault the trial court for failing to define more specifically the word "wrong."

The most that can be said for defendant is that he believed the killings were justified under his personal code of morality. He viewed society with contempt, stating: "[t]o me, they're the folly-ridden mass, they're controlled by their popular beliefs." As defendant testified, "the law is not for me. The law is for subservient people." His moral code was based on "indulgence instead of abstinence" and "might makes right." Although defendant believed that under his own moral code he was justified in killing Abrahamsen and Marchyshyn, that belief does not nullify his appreciation that the killings were wrong according to law and the morals of society. Belief in an idiosyncratic code of morality does not constitute the defense of criminal insanity. If the insanity defense were so readily available, the life of each member of society would be imperilled by the whims of every other member.

Finally, Dr. Sadoff was presented as an expert on psychiatry, not law. Before he testified, counsel engaged in an extensive sidebar argument concerning the scope of Dr. Sadoff's testimony. Following that conference, Dr. Sadoff testified without objection that defendant did not suffer from a disease of the mind, "that he did know the nature and quality of his act, and he did know what he was doing was wrong." At no point did Dr. Sadoff wander from his realm of medical expertise and invade the province of the court. Counsel were sensitive to the role of the court as the source of instructions on the law. For its part, the court provided the jury with an adequate charge to

determine the facts. We perceive no error, much less plain error, in that charge.

## IV

■ Before us, defendant contends that, because he succeeded in causing the knowing or purposeful death of Abrahamsen, he could not as a matter of law be convicted of the knowing or purposeful homicide of Marchyshyn. More specifically, defendant urges that his intent to knowingly or purposely kill Abrahamsen may not be transferred to the death of Marchyshyn.

Although defendant couches his argument in terms of "transferred intent," the issue actually is one of causation. The argument invites our consideration of the causation section of the New Jersey Penal Code (the New Jersey Code), *N.J.S.A.* 2C:2-3d. That section provides in relevant part:

d. A defendant shall not be relieved of responsibility for causing a result if the only difference between what actually occurred and what was designed, contemplated or risked is that a different person or property was injured or affected or that a less serious or less extensive injury or harm occurred.

When charging the jury, the trial court instructed:

But, if you think, and it's up to you, even though he didn't purposely or knowingly kill him [Marchyshyn], if the result was the same as the purpose that he had regarding Abrahamsen, then he's guilty of murder even if he tells you, well, I didn't intend to kill him * * *.

Defendant challenges the charge as stating an incorrect theory of law. Specifically, defendant says that the trial court should not have charged that the jury could find defendant liable for the knowing or purposeful murder of Marchyshyn. Defendant argues that he knowingly or purposely attempted to kill only Abrahamsen, that he succeeded in that attempt, and that the jury found him guilty of the knowing or purposeful murder of Abrahamsen. Continuing, defendant contends that Marchyshyn's death was an accidental result of the killing of Abrahamsen, and that the only offense for which he should have been charged concerning Marchyshyn's death is reckless manslaughter, *N.J.S.A.* 2C:11-4b(1). We disagree.

Even before the adoption of the New Jersey Penal Code, this State recognized that a defendant who shot one victim with the intent to cause that victim's death could be found guilty of the murder of a different, unintended victim. The underlying "principle is that the intent with which a criminal act is done determines the legal character of its consequences * * *. [T]his doctrine has its chief application in cases where such consequences have operated upon a different person from that intended * * *." *State v. Gallagher*, 83 *N.J.L.* 321, 323 (Sup. Ct.1912). In effect, the intent to kill one victim was transferred to the death of the other victim. *State v. Humphreys*, 99 *N.J.Super.* 534, 536 (App.Div.1968). The critical consideration in determining the degree of murder for which the defendant could be liable was his or her state of mind, "and not the measure of success that attended its accomplishment." *State v. Becsta*, 71 *N.J.L.* 322, 326–27 (E. & A.1904). When a defendant intentionally shoots at one victim but kills another, his punishment should be consistent with his intent and not his bad aim. Federal courts have likewise applied the principle of "transferred intent" in cases "where the intended victim is killed by the same act that kills the unintended victim." *United States v. Sampol*, 636 *F.*2d 621, 674 (D.C.Cir.1980); *United States v. Weddell*, 567 *F.*2d 767, 769–70 (8th Cir.1977), *cert. denied*, 436 *U.S.* 919, 98 *S.Ct.* 2267, 56 *L.Ed.*2d 761 (1978).

Defendant, however, urges that the "transferred intent" doctrine should not apply when both the intended and unintended victim are killed. He asserts that his success in purposely killing Abrahamsen limits his exposure for the death of Marchyshyn to reckless manslaughter. This argument proceeds from the assumption that the only purpose of *N.J.S.A.* 2C:2–3d is to insure that an actor who succeeds in knowingly or purposely causing harm, albeit not to the intended victim, should be punished consistent with his culpability. Because the actor will be punished when the intended victim is killed, the argument continues, there is no need to "transfer" the intent to the unintended victim. *See People v. Czahara*, 203 *Cal.App.*3d

1468, 1474–75, 250 *Cal.Rptr.* 836, 839–40 (1988); *People v. Birreuta,* 162 *Cal.App.*3d 454, 460, 208 *Cal.Rptr.* 635, 638–39 (1984).

We find nothing in the legislative history or plain language of *N.J.S.A.* 2C:2–3d that would limit the application of the statute to a situation in which only the unintended victim is harmed. To the contrary, we believe that the Legislature intended the statute to serve as a strong deterrent to those contemplating injury to another. When a defendant contemplates or designs the death of another, the purpose of deterrence is better served by holding that defendant responsible for the knowing or purposeful murder of the unintended as well as the intended victim. Hence, we reject defendant's argument that the successful killing of the intended victim prevents the "transfer" of that intent to an unintended victim.

When defendant killed Marchyshyn, Abrahamsen was still alive. It was only by pursuing Abrahamsen after causing Marchyshyn's death that defendant also murdered his intended victim. Had defendant not pursued him spraying bullets, Abrahamsen might have survived. In that case, defendant would have been liable for the attempted murder of Abrahamsen, and under *N.J.S.A.* 2C:2–3d for the knowing and purposeful murder of Marchyshyn. Defendant urges that his success in killing Abrahamsen should reduce the killing of Marchyshyn to reckless homicide, a second-degree offense. *N.J.S.A.* 2C:11–4c. In effect, defendant asks us to reduce his liability for the death of Marchyshyn because he pursued and killed Abrahamsen.

Returning to the words of the statute, the New Jersey Code does not relieve a defendant of responsibility for his or her conduct merely because another person is injured. *N.J.S.A.* 2C:2–3d. Consequently, the court properly charged the jury that defendant could be found guilty of the knowing or purposeful death of Marchyshyn even if Abrahamsen was the intended victim.

## V

■ Defendant also claims that his confession was obtained in violation of his rights under the fourth amendment to the United States Constitution. This violation, he asserts, compels reversal of his conviction. He argues that he was arrested without probable cause and that his confession should have been suppressed under the fourth amendment as the illegal "fruit" of that arrest. At the suppression hearing, however, defendant relied primarily on an alleged violation of fifth amendment privileges against self-incrimination.

As adduced at the suppression hearing, the facts are that Officer Barry Wohl and several other police officers were dispatched on June 28, 1983, at approximately 5:00 p.m., to "try and locate a Carl Worlock." Officer Wohl proceeded in a police car to the home of defendant's parents, where he parked and waited. At approximately 5:40 p.m., defendant approached the car. In response to an inquiry from Officer Wohl, defendant identified himself as Carl Worlock. According to defendant, he had decided to give himself up because he knew the police were looking for him and because his father had told him that he should talk with the police. Officer Wohl informed defendant that he was wanted for questioning as a material witness concerning the deaths of Abrahamsen and Marchyshyn and that he was under arrest. He further advised defendant of his *Miranda* rights, handcuffed him, placed him in the back seat of the patrol car, and drove him to the Jackson Township police headquarters. Approximately ten minutes elapsed between the time of defendant's arrest and the time of his arrival at police headquarters, during which Officer Wohl did not question him. On arriving at headquarters, Wohl removed the handcuffs.

Although defendant thought two hours elapsed at the police station before he was questioned, the record establishes that the interval was approximately one-half hour. Investigator Mahoney, who conducted the questioning with Sergeant Burns, testified that the interview began at 6:25 p.m., about thirty-five

minutes after defendant's arrival at the police station. That testimony is corroborated by the fact that defendant signed a consent-to-questioning form at 6:29 p.m. and at 6:33 p.m. signed a waiver of his *Miranda* rights. The transcript of defendant's taped confession reflects that defendant began his statement at 6:50 p.m.

Before questioning, defendant sat alone in the Detectives' Bureau, a room approximately fifteen feet by twenty-four feet, containing four or five desks and several lockers. During this period, he drank soda and smoked cigarettes.

Mahoney and Burns did not confer with Wohl before questioning defendant, and they were unaware that Wohl had brought defendant to the station. They believed defendant appeared voluntarily as a witness and was free to leave at any time. According to Mahoney's testimony, he had been told only "that when the body of Mr. Abrahamsen had been searched, * * * Mr. Worlock's wallet was in his pocket, that Mr. Worlock had been brought into police headquarters, [and] that Mr. Worlock was awaiting both [himself] and Detective Burns for an interview." Mahoney acknowledged that he did not "have enough evidence himself to place [defendant] under arrest for murder * * *."

After defendant signed the consent-to-questioning and *Miranda*-waiver forms, Mahoney and Burns interviewed him for approximately ten to twenty minutes. In response to the first question, Worlock immediately confessed to the shootings. He then recounted the details of the two homicides. At 6:50 p.m., defendant gave a taped statement in which he repeated the details of the crimes. During the taping, Mahoney left the room to bring defendant another soda. Although defendant testified that six police officers were present in the room when he confessed, Mahoney testified that he and Burns were alone with defendant during the interrogation. The trial court did not resolve this conflict in its findings.

Based on the preceding evidence, the trial court denied defendant's motion to suppress his confession, finding that defendant was not under arrest when he confessed. Because it found that defendant had voluntarily accompanied Officer Wohl to the station house, the court did not determine whether the police had probable cause to arrest defendant. The Appellate Division took a different approach. That court apparently found that defendant had been arrested, but affirmed the admission of the confession because the police had probable cause to arrest.

For different reasons from those of either of the lower courts, we also conclude that the confession was not obtained in violation of defendant's constitutional rights.

Defendant does not contend on appeal that his confession was obtained in violation of his fifth amendment privilege against self-incrimination. He argues, however, that the confession should be suppressed because it was obtained in violation of his rights under the fourth amendment. The initial question is whether the police "seized" or arrested defendant. Officer Wohl not only believed that he was arresting defendant, but told him so. Although the trial court found that defendant had not been arrested, the Appellate Division apparently disagreed. Given defendant's constrained condition on arrival at police headquarters, we find that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 *U.S.* 567, 573, 108 *S.Ct.* 1975, 1979, 100 *L.Ed.*2d 565, 572 (1988). We therefore agree with the Appellate Division that defendant had been arrested before his interrogation.

That the arrest was based on probable cause, as the Appellate Division found, is more problematic. The record on the existence of probable cause is sparse. One reason for the absence of a better record is that defense counsel did not raise the possibility of a fourth amendment violation until after the end of the suppression hearing. At the request of defense

counsel, the court deferred argument on the suppression motion until the following morning. Then, for the first time, one hour before the commencement of trial, counsel informed the court that he was seeking suppression of the statement on the alternative ground that defendant's fourth amendment rights had been violated. No one requested that the hearing be reopened, and the court decided both the fourth and fifth amendment claims on the already-established record.

Our review of the record reveals that when defendant was arrested, the police knew only that he had been seen with the two victims on the morning of the shootings; that his wallet was found on Abrahamsen's body; and that because his wallet contained a Nevada driver's license, defendant might flee from New Jersey. Testimony of Abrahamsen's girlfriend and her friend, presented at trial but not at the suppression hearing, suggests that the police also knew that defendant was angry because Abrahamsen had taken his wallet and that defendant owned a twenty-two caliber rifle. This additional evidence might support a finding of probable cause. For our purposes, however, we shall assume that the record falls short of such a finding. In making that assumption, we recognize that with arrests just short of probable cause, suppression is less likely to be warranted. See 4 W. LaFave, *Search and Seizure* § 11.4(b) at 396 (1987) (LaFave). For us, the question is properly viewed as whether the confession should be suppressed because it was obtained from a defendant who had been arrested without probable cause.

As a general rule, a confession obtained through custodial interrogation after an illegal arrest should be excluded unless the chain of causation between the illegal arrest and the confession is sufficiently attenuated so that the confession was "sufficiently an act of free will to purge the primary taint." *Wong Sun v. United States,* 371 *U.S.* 471, 486, 83 *S.Ct.* 407, 416–17, 9 *L.Ed.*2d 441, 454 (1963). Suppression of such confessions deters the police from making illegal arrests. *Brown v.*

*Illinois,* 422 *U.S.* 590, 601–03, 95 *S.Ct.* 2254, 2260–61, 45 *L.Ed.*2d 416, 425–26 (1975). By its nature, the determination whether a confession is the product of the defendant's free will depends on the facts of each case. *Id.* at 603, 95 *S.Ct.* at 2261, 45 *L.Ed.*2d at 427.

Although *Miranda* warnings, such as those administered to defendant, are "important * * * in determining whether the confession is obtained by exploitation of an illegal arrest," such warnings are not always sufficient to "break * * * the causal connection between the illegality and the confession." *Ibid.* Other factors to be considered are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 *S.Ct.* at 2261–62, 45 *L.Ed.*2d at 427 (citations and footnotes omitted). Implicit in the analysis is a "value judgment" whether the deterrent purpose of the exclusionary rule is outweighed by the "competing purpose of discovering the truth in a criminal trial." *State v. Barry,* 86 *N.J.* 80, 87, *cert. denied,* 454 *U.S.* 1017, 102 *S.Ct.* 553, 70 *L.Ed.*2d 415 (1981).

■ As a threshold matter, we find no violation of defendant's fifth amendment rights. The police conscientiously administered *Miranda* warnings both when defendant was arrested and when he was questioned. The circumstances surrounding his confession, including the signing of a waiver, demonstrate that he knowingly and voluntarily waived his fifth amendment rights before confessing. This "important factor," *Brown, supra,* 422 *U.S.* at 603, 95 *S.Ct.* at 2261, 45 *L.Ed.*2d at 427, weighs against Worlock's claim that the confession was obtained by exploitation of an illegal arrest, *Rawlings v. Kentucky,* 448 *U.S.* 98, 107, 100 *S.Ct.* 2556, 2562, 65 *L.Ed.*2d 633, 643 (1980).

Turning to the three factors set forth in *Brown,* we consider first the temporal proximity of the confession and arrest. This

factor, which may be "ambiguous," *Dunaway v. New York*, 442 *U.S.* 200, 220, 99 *S.Ct.* 2248, 2260–61, 60 *L.Ed.*2d 824, 841 (1979) (Stevens, J., concurring), is the least determinative. La-Fave, *supra*, § 11.4(b) at 393. Although a confession given shortly after an arrest may result from pressures generated by the shock of detention, it may also result from considerations unrelated to the arrest. *Dunaway, supra*, 442 *U.S.* at 220, 99 *S.Ct.* at 2260–61, 60 *L.Ed.*2d at 841 (Stevens, J., concurring). The cause of the confession following a lengthy detention is similarly ambiguous. A long detention may cause a defendant to forget the shock of the initial arrest or it may compound the taint of the confession. *Ibid.*

The conditions of detention can be as important as the temporal proximity of the confession and arrest. A congenial atmosphere can neutralize the assumption that a confession given after a short period of detention is the product of an illegal arrest. *Rawlings, supra*, 448 *U.S.* at 107–08, 100 *S.Ct.* at 2563, 65 *L.Ed.*2d at 643–44. Here, defendant confessed approximately forty-five minutes after arrest and immediately after the commencement of questioning. As soon as defendant arrived at police headquarters, the handcuffs were removed and he was left unattended, given several sodas, and allowed to smoke cigarettes. Although police headquarters can be inherently intimidating, the relaxed atmosphere surrounding the interrogation did not aggravate, and may have attenuated, the taint of the arrest. Thus, we find that this "ambiguous factor" weighs in favor of admission of the confession. *Ibid.*

Intervening events, which serve as objective indications that the causal connection between the arrest and confession has been broken, can be the most important factor in determining whether a confession is tainted. Identifying an intervening circumstance, however, can be difficult. LaFave, *supra*, § 11.4(b) at 398. In the face of egregious police conduct, the State should show some "demonstrably effective break in the chain of events leading from the illegal arrest to the statement, such as actual consultation with counsel or the accused's pre-

sentation before a magistrate for a determination of probable cause." *Brown, supra,* 422 *U.S.* at 611, 95 *S.Ct.* at 2265, 45 *L.Ed.*2d at 432 (Powell, J., concurring); LaFave, *supra,* at 402.

We find no evidence of egregious police conduct that contributed to defendant's confession. Defendant testified he intended to surrender to the police when he approached the police car. As a Michigan court held, clear evidence that before his arrest defendant intended to turn himself in and confess is sufficient to show that "the confession was not obtained by exploitation of the illegal arrest." *People v. Emanuel,* 98 *Mich.App.* 163, 178–79, 295 *N.W.*2d 875, 882 (1980). Here, defendant confessed in answer to the first question posed to him. Under these circumstances, defendant's own conduct reflects that his confession was not so much the product of coercion as of his own free will. *See United States v. Houle,* 620 *F.*2d 164, 165–66 (8th Cir.1980) (unsolicited statement to cellmate is not tainted); *Brown v. State,* 503 *N.E.*2d 405, 408 (Ind.1987) (defendant's unsolicited request to give a statement was intervening event purging taint of arrest); *see* LaFave, *supra,* at 399–400 n. 155.

Finally, the purpose and flagrancy of police misconduct is "particularly" relevant to determining whether a confession is the "fruit" of that arrest. *Brown, supra,* 422 *U.S.* at 604, 95 *S.Ct.* at 2262, 45 *L.Ed.*2d at 427. In this case, the police conduct was more casual than calculating. Defendant's arrest occurred when he approached Officer Wohl with the intention to "give himself up." Wohl did not draw his gun, and, consistent with standard police practice, placed defendant in handcuffs before driving him to the police station. The officer told defendant not that he was suspected of killing Abrahamsen and Marchyshyn, but that he was wanted for questioning as a material witness. So informal was defendant's apprehension that the interrogating officers thought defendant had not been arrested, a thought that was shared by the trial court. Although not a model for law enforcement, the police work was not so much flagrant as diffident.

We are left with the impression that the police sought defendant to question him concerning the shootings, not necessarily to arrest him. Although an arrest occurred, the police did not flagrantly or purposely violate defendant's constitutional rights. Weighing the totality of the circumstances, *Rawlings, supra,* 448 *U.S.* at 110, 100 *S.Ct.* at 2564, 65 *L.Ed.*2d at 645, we conclude that the confession "was the product of the defendant's free will, rather than the result of the exploitation of an illegal arrest," *Barry, supra,* 86 *N.J.* at 90.

## VI

Defendant's remaining argument, that his conviction should be reversed because of the ineffective assistance of counsel, is premised primarily on trial counsel's failure to raise the novel legal arguments concerning the insanity defense and transferred intent that we have rejected. The failure to raise unsuccessful legal arguments does not constitute ineffective assistance of counsel. *See Strickland v. Washington,* 466 *U.S.* 668, 688, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984); *State v. Fritz,* 105 *N.J.* 42, 52 (1987). We find no merit to the argument that trial counsel rendered constitutionally-ineffective assistance.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.