54 A.3d 318

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL CARRERO, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. ANDRES F. BALUSKI, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 10, 2012—Decided October 23, 2012.

498

Before Judges PARRILLO, SABATINO and FASCIALE.

*Robyn B. Mitchell,* Deputy Attorney General, argued the cause for appellant (*Jeffrey S. Chiesa,* Attorney General, attorney; *Ms. Mitchell,* of counsel and on the brief).

*Samuel Louis Sachs* argued the cause for respondent *Michael Carrero* in A–3232–11 (*Law Offices of Samuel Louis Sachs,* attorney; *Lauren E. Scardella,* of counsel and on the brief).

*Steven W. Hernandez* argued the cause for respondent *Andres F. Baluski* in A–4319–11.

The opinion of the court was delivered by

SABATINO, J.A.D.

These two interlocutory appeals, which we consolidate for the purposes of this opinion, arise from similar orders of the Law

Division granting defendants certain discovery in drunk driving prosecutions. Specifically, the orders permit defense counsel and defense experts to inspect and photograph rooms within the police stations where defendants respectively provided breath samples for the Alcotest in order to verify that the tests were properly administered. The State opposes the requested access to the interior of the police stations, arguing that such access is unnecessary and also raises countervailing security concerns.

For the reasons that follow, we reverse the discovery orders because defendants have not shown a reasonable justification to conduct the requested inspections.

## I.

The record supplied in each of these interlocutory appeals is exceedingly limited. We have been told little about the underlying facts and circumstances, except that each defendant was arrested for drunk driving, was brought to a police station, provided breath samples on the Alcotest device, and thereafter sought and was granted judicial permission for his counsel (and/or an expert witness) to inspect and photograph the interior of the police station where the Alcotest was administered. The pertinent details from the sparse appellate record with respect to each defendant are as follows.

### Carrero

On July 3, 2011, Michael Carrero, defendant in A–3232–11, was charged in the municipal court in Toms River Township with driving while intoxicated ("DWI"), *N.J.S.A.* 39:4–50; reckless driving, *N.J.S.A.* 39:4–96; failure to maintain his vehicle in its lane, *N.J.S.A.* 39:4–88(b); and delaying traffic, *N.J.S.A.* 39:4–56. The DWI charge against Carrero apparently is based upon an Alcotest report showing that his blood alcohol content ("BAC") exceeded the legal limits.

Defense counsel for Carrero thereafter served the municipal prosecutor with pretrial discovery requests. One of those requests sought the following:

7. An opportunity for defense experts and/or counsel *to view, inspect, diagram and photographically and/or electronically record other electronic devices in the breath test [Alcotest] device and simulator rooms, as well as adjoining (side, above or below) and nearby rooms (within approximately 100 feet) which may emit electromagnetic interference (EMI) including but not limited to radio frequency interference, i.e., photocopying machines, radio transmitters, microwave oven, computer terminals, etc.* Said opportunity includes photocopying of instruction and service manuals for any electrical or electronic devices located in the area. This inspection should be permitted at the time of pre-trial [proceedings] and/or trial in this matter[.]

[Emphasis added.]

Carrero's attorney requested this inspection in order to verify that there were no electromagnetic interference-emitting devices in or near the testing room at the Toms River police station that could have interfered with the Alcotest's operation.

The State has opposed this discovery request. It maintains that such an inspection is unnecessary. Moreover, the State contends that the security of the police station would be compromised if private individuals were allowed to inspect and photograph its interior for this purpose.

The municipal judge in Toms River granted the requested discovery, including the inspection of the interior of the police station, except that he denied Carrero's associated request to copy the police instruction manuals. The State then moved in the Law Division for leave to appeal the Toms River judge's discovery ruling. Carrero did not cross-appeal the denial of access to the manuals.

After hearing oral argument, the Law Division judge declined to grant the State interlocutory relief from the discovery order. In his oral decision, the Law Division judge acknowledged that he was "sympathetic" to the State's security concerns, but nonetheless concluded that the requested inspection was reasonable. The Law Division judge further noted that the State could seek a protective order to limit the dissemination of photographs or diagrams created as a result of the inspection. The Law Division

judge consequently entered an order on January 4, 2012 denying the State's application for leave to appeal the municipal court's order allowing the inspection. We subsequently granted the State's motion for leave to appeal.[1]

*Baluski*

On June 18, 2011, Andres F. Baluski, defendant in A–4319–11, was charged in Stafford Township by the State Police with DWI, *N.J.S.A.* 39:4–50. Baluski apparently failed an Alcotest administered at the Bass River barracks of the State Police following his arrest.

During the course of pretrial discovery in the municipal court, Baluski's attorney similarly requested to inspect, in the company of an expert, the room at the barracks where the Alcotest had been administered. Baluski presented a different justification for his request than Carrero. Specifically, Baluski sought access to the testing room to confirm that it is physically arranged to enable a police officer to have continuously observed him for twenty minutes before the Alcotest was administered. Such continuous pre-testing observation for the Alcotest has been mandated by the Supreme Court in *State v. Chun,* 194 *N.J.* 54, 79, 943 *A.*2d 114, *cert. denied,* 555 *U.S.* 825, 129 *S.Ct.* 158, 172 *L.Ed.*2d 41 (2008).

The municipal judge in Stafford Township denied Baluski's inspection request. In doing so, the municipal judge acknowledged that he had allowed such interior photographs to be taken by the defense in some past cases, but expressed misgivings that those defense photographs had typically been taken in such a way so as to not depict "what is actually in the room."

Baluski's attorney moved before the Law Division for leave to appeal the inspection denial. The application was heard, coincidentally, by the same Law Division judge in Ocean County who had previously ruled on the discovery request in *Carrero.* The

---

[1] The record in *Carrero* does not reflect that a stay of the court-ordered inspection was issued. However, the parties acknowledged at oral argument before us that the inspection has not occurred, pending this court's decision.

State opposed the application, contending that the inspection is unwarranted, among other things, because defense counsel can explore the officer's post-arrest observations of Baluski by simply questioning the officer. The State also raised security considerations.

Following oral argument, the Law Division judge once again concluded that the requested inspection of the police station was justified. The judge found that the physical layout of the testing room was at the heart of Baluski's anticipated defense contesting the Alcotest results. The judge stopped short of declaring that all DWI defendants with adverse Alcotest readings are entitled to such an inspection, but found the request was a reasonable one in Baluski's case. The judge also found that inspecting the room is not invasive, nor does it impose hardship or inconvenience upon the State. He also noted that the State's security concerns are "easily remedied" because a trooper can escort defense counsel or a defense expert into the room to ensure that there are not any security breaches.

The Law Division judge accordingly issued an order on March 13, 2012, stating that Baluski and his counsel were entitled to a "brief visual inspection of the Bass River Alcotest 7110 ... under the supervision and reasonable conditions of the Bass River law enforcement personnel." The Law Division judge further ordered that defendant's representatives may inspect and photograph the room in which the Alcotest machine was stored on June 18, 2011. The following day, the judge granted a motion by the State to stay his order, pending the State's pursuit of interlocutory review in this court. We subsequently granted the State leave to appeal, ordering that the matter be calendared in tandem with the State's appeal in *Carrero*.

## II.

### A.

The Alcotest 7110 MKIII-C is widely used in New Jersey to test the BAC of persons who have allegedly violated *N.J.S.A.*

39:4–50. *Chun, supra,* 194 *N.J.* at 65, 943 *A.*2d 114. As the Supreme Court in *Chun* noted in sustaining, subject to certain conditions, the reliability of the device and the admissibility of the generated results, the Alcotest measures the amount of alcohol present in a person's breath as an indirect measure of the amount of alcohol present in the person's blood. *Id.* at 78, 943 *A.*2d 114. It uses both infrared ("IR") and electric chemical ("EC") oxidation in a fuel cell to measure the concentration of alcohol in the person's breath. *Ibid.* For each breath sample, the Alcotest therefore produces two measurements. *Ibid.* The Alcotest issues the IR and EC measurements on a printout from the machine, referred to as the Alcohol Influence Report ("AIR"). *Id.* at 79, 943 *A.*2d 114.

The Alcotest is different from a "breathalyzer" device, which was widely used in this State before the Alcotest. *Id.* at 74–75, 943 *A.*2d 114. One advantage of the Alcotest over a breathalyzer is that the Alcotest is not "operator-dependent" because it uses a computerized program and a series of visual prompts that direct the operator through the analysis. *Id.* at 79, 943 *A.*2d 114. For example, the Alcotest's programming requires the operator to wait twenty minutes before administering the test. *Ibid.* The operator is required to observe the test subject during that twenty–minute waiting period so as to be sure that the subject does not ingest anything, regurgitate anything, or chew gum or tobacco, all of which could taint the testing results. *Ibid.* If the test subject does any of these things, the operator must restart the observation period. *Ibid.*

The Alcotest applies a series of automatic calibration tests designed to ensure that the device is working properly and that it is accurately measuring the concentration of alcohol. *Id.* at 80, 943 *A.*2d 114. If the device is properly calibrated, it will prompt the operator to collect a breath sample. *Ibid.* The device then will automatically carry out a process to ensure that each breath sample is taken without contamination from other samples. *Id.* at 80–81, 943 *A.*2d 114. This process includes purging air from the

test chamber multiple times and excluding a new breath sample for a two-minute period. *Ibid.*

After the testing is complete, the Alcotest will print a detailed list of results on the AIR. *Id.* at 82, 943 *A.*2d 114. The operator retains the printout and gives a copy to the test subject. *Ibid.* If there are errors in testing, the AIR will indicate the errors and their cause. *Ibid.* If the results are within an acceptable tolerance, the AIR will show the subject's BAC for each IR and EC reading for each test. *Id.* at 83, 943 *A.*2d 114. The Alcotest truncates the reading to two decimal places, so as to underreport the concentration reading to the benefit of the test subject. *Ibid.*

Upon an extensive discussion of the Alcotest's operation and functionality and the detailed findings of a Special Master, Judge Michael Patrick King, following months of hearings, the Supreme Court concluded in *Chun* that the Alcotest provides a scientifically reliable measure of a test subject's BAC. *Id.* at 65, 943 *A.*2d 114. The Court imposed certain conditions upon that holding in *Chun,* which we shall address in more detail with respect to each defendant's claims for discovery.

### B.

We next turn to the general discovery principles applicable in municipal and DWI prosecutions.

Pursuant to *Rule* 7:7–7(b), "[i]n all cases the defendant . . . shall be allowed to inspect, copy, and photograph or to be provided with copies of any relevant: . . . (6) . . . tangible objects, buildings or places that are within the possession, custody or control of the government. . . ." *Rule* 7:7–7, because it falls under Part VII of the Rules of Court, applies to prosecutions in municipal court, as here. *R.* 7:1.

The text of *Rule* 7:7–7 closely mirrors the text of *Rule* 3:13–3(a), which pertains to pre-indictment discovery in Law Division matters. *Rule* 3:13–3(a) states that "the prosecutor shall upon request permit defense counsel to inspect and copy or photograph

any relevant material which would be discoverable following an indictment pursuant to section (b) or (c)." By analogy, related cases addressing the scope and applicability of *Rule* 3:13–3(a) are germane to the application of *Rule* 7:7–7. *See, e.g., State v. Ford,* 240 *N.J.Super.* 44, 48, 572 *A.*2d 640 (App.Div.1990) (citing *Rule* 3:13–3 in a discussion of the scope of discovery in a municipal court prosecution for DWI); *see also State v. Maricic,* 417 *N.J.Super.* 280, 283–84, 9 *A.*3d 1026 (App.Div.2010) (referencing *Ford* and noting that *Rules* 3:13–3(b) and 7:7–7 are substantially similar).

Our courts have applied a narrower concept of "relevant" discovery in DWI cases, which are quasi-criminal in nature, than in full-fledged criminal cases. In *State v. Tull,* 234 *N.J.Super.* 486, 499–500, 560 *A.*2d 1331 (Law Div.1989) (citing former *Evid. R.* 1(2), now codified as *N.J.R.E.* 401), the trial court found that the appropriate definition of "relevant" to govern discovery in a DWI proceeding was the one given in the Rules of Evidence: "evidence having any tendency in reason to prove any material fact." This court subsequently rejected the *Tull* standard in *Ford, supra,* because it was a "broad definition that is impractical in the context of quasi-criminal drunk driving cases," and because " 'allowing [such] a defendant to forage for evidence without a *reasonable basis* is not an ingredient of either due process or fundamental fairness in the administration of the criminal laws.' " *Ford, supra,* 240 *N.J.Super.* at 49, 572 *A.*2d 640 (quoting *State v. Laurick,* 231 *N.J.Super.* 464, 473, 555 *A.*2d 1133 (App.Div.1989), *rev'd,* 120 *N.J.* 1, 575 *A.*2d 1340, *cert. denied,* 498 *U.S.* 967, 111 *S.Ct.* 429, 430, 112 *L.Ed.*2d 413 (1990)).

Therefore, an accused's right to discovery in a DWI prosecution is limited to items as to which "there is a reasonable basis to believe will assist a defendant's defense." *Ibid.* A DWI defendant cannot require the court to compel the State to reveal information which merely could *lead to* other information that is relevant. *Maricic, supra,* 417 *N.J.Super.* at 284, 9 *A.*3d 1026; *Ford, supra,* 240 *N.J.Super.* at 48, 572 *A.*2d 640; *cf. R.* 4:10–2(a) (more broadly defining, by contrast, the right of discovery in civil

matters to embrace "information sought [that] appears reasonably calculated to lead to the discovery of admissible evidence"). In essence, the discovery sought in DWI matters must be relevant in and of itself.

However, at least with respect to certain classes of information, a DWI defendant need not have actual knowledge of the facts supporting the contentions that underlie his discovery requests. *Ford, supra*, 240 *N.J.Super.* at 49, 572 *A.*2d 640. For example, we ruled in *Ford* that a DWI defendant was entitled to discovery respecting the procedures that were used in administering a breathalyzer test, even if the defendant did not personally realize that flawed procedures had been used. *Ibid.* Such information included "the conditions under which the tests were held, the machine operator's competence, the particular machine's state of repair and identification and documentation of the ampoules used for [the] defendant's tests. . . ." *Id.* at 51, 572 *A.*2d 640.

We therefore held in *Ford* that the State ordinarily must provide the defense with "full identification of the instrument used, the date it was first placed in service by the State, the type of instrument used, including the manufacturer, model number and results of the coordinator's testing of the instrument for approximately one year to include the next testing after [the] defendant's tests." *Id.* at 52, 572 *A.*2d 640. Additionally, the State must provide "the time of administration of the tests and the results and all reports and relevant documents signed by [the] defendant or pertaining to his condition of sobriety including blood and urine tests. . . ." *Ibid.* We treated such requested discovery as relevant and obtainable because it " '(1) concerns an issue involved in the prosecution, and (2) tends, reasonably, to prove a fact material to such an issue.' " *Id.* at 49, 572 *A.*2d 640 (quoting *Tull, supra*, 234 *N.J.Super.* at 499, 560 *A.*2d 1331). On the other hand, we held in *Ford* that the State should not be routinely required to produce manuals for the instrument, its entire repair record, or other related documents dating back more than twelve months. *Id.* at 51–52, 572 *A.*2d 640.

The Supreme Court in *Chun* adopted a similarly circumscribed approach to discovery with respect to the Alcotest, ruling that DWI defendants are generally entitled to certain "foundational documents," but not delineating an automatic right to other discovery for every Alcotest-based case. *Chun*, 194 *N.J.* at 145, 943 *A.*2d 114.

## C.

Consistent with these distinctive principles of relevancy applicable in the DWI context, each defendant before us must demonstrate that the stationhouse inspection that he seeks is reasonable and relevant to a material issue in his prosecution. For the reasons that follow, we conclude that neither defendant has met that burden, and that the Law Division judge erred in granting their respective discovery requests. We address each case individually.

### Carrero

■ As we have already noted, Carrero wishes to inspect and photograph the Toms River police station to check for potential sources of electromagnetic interference ("EMI") and radio frequency interference ("RFI").[2] Not only does he want to inspect the room in which he was tested, but he also wants access to adjoining and nearby rooms within about 100 feet of the testing room. He contends that such discovery bears on the accuracy and reliability of the Alcotest reading that the State will use against him at trial. The basis for this request, however, has been negated by the Court's analysis in *Chun, supra.*

The Court explicitly declared in *Chun* that "there is ample support for the finding that the Alcotest is well-shielded from the impact of any potential RFI that might otherwise affect the

---

[2] RFI and EMI are "subsets of electromagnetic compatibility." *State v. Chun,* No. 58,879, 2007 *N.J. LEXIS* 39, at *63 (Feb. 13, 2007) (Special Master's Report). We will treat the terms as synonymous for the discrete discovery issues before us.

reported results or limit our confidence in the accuracy of the test results." *Chun, supra,* 194 *N.J.* at 89, 943 *A.*2d 114. Judge King, the author of the Special Master's Report ultimately relied upon by the Court, noted that the Alcotest uses a five-layer mother-board and a carrying-case shield to suppress RFI. *Chun, supra,* 2007 *N.J. LEXIS* 39, at *279. Additionally, Judge King noted that the Alcotest's casing has passed various tests for interference. *Id.* at *280.

Carrero argues that, although the Alcotest is well-shielded against RFI, the Court's opinion in *Chun* does not expressly state that the Alcotest is completely impervious to RFI. This is a flawed reading of *Chun.* The Court's opinion plainly indicates that even if RFI is present that might affect the Alcotest's results without shielding, the Alcotest's shielding sufficiently guards against such interference. *See Chun, supra,* 194 *N.J.* at 89, 943 *A.*2d 114. Accordingly, even if sources of RFI happened to be found in the testing area at the Toms River police station where Carrero's blood-alcohol level was tested, those sources would not suffice to call into reasonable question the accuracy or validity of the Alcotest results for the purpose of a DWI prosecution.

This conclusion is also borne out by the Special Master's Report. We must bear in mind that Judge King considered the testimony of thirteen experts on a variety of aspects of the Alcotest when issuing his report. *Chun, supra,* 2007 *N.J. LEXIS* 39, at *2. Based on the evidence before him, Judge King unambig-uously concluded, among other things, that the Alcotest is "well-shielded" against electronic interference, and the Supreme Court adopted that determination. *Chun, supra,* 194 *N.J.* at 89, 943 *A.*2d 114; *Chun, supra,* 2007 *N.J. LEXIS* 39, at *279.

After a discussion of the various protections that the Alcotest's design offers against RFI, cited *infra,* Judge King wrote, "[i]n order to *further* avoid potential interference," the policy promul-gated to all state and local police departments dictates that possible sources of RFI be banned from areas surrounding the Alcotest machines. *Ibid.* (emphasis added). That policy, which

the Court adopted, *Chun, supra*, 194 *N.J.* at 80, 943 *A.*2d 114, only represents an added precaution. The Court did not state in *Chun* that adherence to such a policy was strictly necessary to prevent RFI from tainting a test result.

Carrero insists that the removal of all possible sources of RFI within range of the testing area is scientifically essential, and that a police department's failure to do so can render the Alcotest results inadmissible. Whether or not that proposition is true (or even debatable) as a matter of science, it is not the principle that must now guide us as a matter of law. The Court in *Chun* has already settled the legal and evidentiary issue by unambiguously embracing the Special Master's finding that the Alcotest is "well shielded" from RFI interference. *Id.* at 89, 943 *A.*2d 114. In essence, Carrero is now attempting to use this appeal to re-litigate the RFI interference issue that was already addressed and re-solved in *Chun*. We decline the invitation to do so. *See State v. Hill*, 139 *N.J.Super.* 548, 551, 354 *A.*2d 670 (App.Div.1976) (noting our limited role as an intermediate appellate court and our obligation to adhere to the Supreme Court's determinations).

In reviewing Judge King's findings, the Court concluded in *Chun* that twelve so-called "foundational documents" must be produced by the State in discovery to help substantiate that the Alcotest machine used to determine the defendant's blood-alcohol level produced a scientifically reliable measurement. *Chun, supra*, 194 *N.J.* at 142–45, 943 *A.*2d 114. Notably, a document attesting that the Alcotest operator had performed a search of the surrounding area for possible RFI sources is not included in that list, although we recognize that the list of discoverable documents identified in *Chun* is not necessarily all-encompassing. *Cf. Maricic, supra*, 417 *N.J.Super.* at 288, 9 *A.*3d 1026.

Moreover, Carrero's request to inspect the Toms River police station for possible sources of RFI is unlikely to reveal anything definitive about possible sources of RFI that may have been located there on the day of his testing. Walkie talkies, cell phones, radios, and other possible sources of RFI are all portable

instruments. What was present on the day of his testing may well have been moved since that time. Conversely, any possible sources of RFI that might now be found in a current inspection of the police station could have been placed there after the testing was conducted.

We appreciate Carrero's generic concern that individual police departments may sometimes lapse in adhering to the statewide policy to keep items that can emit RFI away from rooms where the Alcotest is administered.[3] Even so, we are satisfied that the State has presented sufficient countervailing reasons to overcome any claim that the requested inspection is reasonable and will produce relevant evidence. The State has valid security interests in discouraging routine access by civilian visitors to the interior of police facilities. *See N.J.R.E.* 515 (codifying a privilege from disclosure for official information). It has been observed that a police station, as well as a detention center or a jail holding cell, "is a place 'fraught with serious security dangers.'" *Justice v. Peachtree City,* 961 *F.*2d 188, 193 (11th Cir.1992) (quoting *Bell v. Wolfish,* 441 *U.S.* 520, 559, 99 *S.Ct.* 1861, 1884, 60 *L.Ed.*2d 447, 481 (1979)). Although those security interests are not absolute, they have not been outweighed in Carrero's case. He has presented no case-specific basis, particularly given *Chun* 's rejection of the RFI claim and the State's security interests, demonstrating that his inspection demand is reasonable.

For all of these reasons, we conclude that the municipal court and the Law Division erred in granting the defense in *Carrero* access to the Toms River police station. The Law Division's order dated January 4, 2012 is therefore reversed, and the municipal court's grant of this discovery vacated.

---

[3] At oral argument, defense counsel anecdotally represented that such items have been found at times within the prohibited area in some police departments. However, such anecdotal information is not in the record and, for the reasons that we have noted stemming from the Supreme Court's decision in *Chun* and the court's declaration that the Alcotest is "well–shielded" from RFI, it has no bearing on our analysis of Carrero's circumstances.

*Baluski*

As we have already noted, the Supreme Court in *Chun* instructed that the test subject must be continuously observed for twenty minutes before the Alcotest is administered. *Supra,* 194 *N.J.* at 79, 943 *A.2d* 114. The purpose of this twenty-minute observational period is to assure that the driver providing the breath samples has not ingested anything, vomited, or otherwise had something in his mouth or breath that could alter the Alcotest readings. *Ibid.* The State must establish this condition by clear and convincing evidence. *State v. Ugrovics,* 410 *N.J.Super.* 482, 489–90, 982 *A.2d* 1211 (App.Div.2009), *certif. denied,* 202 *N.J.* 346, 997 *A.2d* 231 (2010). The observation may be conducted through non-visual as well as visual means, so long as the observer is able to detect whether the driver has ingested or regurgitated something that would confound the Alcotest results. *State v. Filson,* 409 *N.J.Super.* 246, 258–61, 976 *A.2d* 460 (Law Div.2009).

Baluski contends that he is entitled to inspect and photograph the testing room at the State Police barracks in Bass River in order to verify that the Alcotest operator was physically able to observe him during the pre-test period. There is no reasonable basis shown in this record to authorize such an intrusion into the barracks.

A defendant himself should know whether or not he put something into his mouth, vomited, or otherwise whether something else occurred to his oral cavity during the twenty-minute pre-test period. To be sure, a defendant may have been inebriated at the time and thus impaired in his perceptions or recollections, but that is precisely why the Alcotest is being administered. A DWI defendant who was too impaired to appreciate what was going on around him should not have any greater right to discovery because of his degree of intoxication. Notably, there is no assertion here by Baluski that he recalls vomiting or ingesting anything during the pre-test period that the operator failed to observe.

In addition, the physical configuration of the testing room has already been witnessed by defendant himself. Again, the possibil-

ity that defendant was too impaired to see or recall whether the officer was in his visual presence before the test was administered is not a valid justification to give defendant or his agents a second chance to observe the room. We recognize that an arrested driver, even one who is sober or not intoxicated above the legal limits, may be injured, upset, confused, or frightened and that his ability to observe and recall the layout of the testing room may be diminished for benign reasons. Even so, that does not warrant allowing defense counsel to access the interior of a police barracks in every DWI case as a matter of course. Instead, there must be a showing of a particularized reasonable basis to justify the intrusion.

We thus hold that a DWI defendant is not entitled in pretrial discovery to have his attorney or expert gain access to the interior of the police barracks unless an affirmative showing of reasonable need is demonstrated by such a defendant. For example, if a defendant submits a certification or testifies at a preliminary hearing asserting that no police officer was in the testing room, or in a place where defendant could have been observed, for the obligatory twenty pre-testing minutes, then the court would have the discretion to order such an inspection.[4] Likewise, if genuine doubt about the ability to have observed the suspect is raised by the testimony of the operator or another State witness who has attested to the observation, *see Ugrovics, supra,* 410 *N.J.Super.* at 490, 982 *A.2d* 1211, that also could provide a specific reasonable justification for an inspection. Neither of those showings has been made here.

Baluski has not affirmatively contended that an officer failed to observe him for the requisite period of time. He has submitted no certification on this issue, and his counsel's brief on appeal does not assert such a claim. At most, his counsel alluded to the

---

[4] In evaluating such a request, the court should consider whether the physical layout of the police station changed from the time of the administration of the Alcotest to the time of the requested inspection.

municipal judge that there were "some questions" as to the ability of the police officer to observe Baluski, and counsel later argued before the Law Division that inspecting the area was thus necessary for a "good defense." These vague assertions by counsel, even though we presume they have been presented in good faith, without some affirmative showing of proof, should not suffice as a basis for allowing the requested barracks inspection. As it stands, the layout of the area surrounding the Alcotest machine is not sufficiently "relevant" under *Rule* 7:7–7 here because there is no reasonable basis in this record to conclude that inspecting the area will be important to his defense.[5]

Lastly, Baluski suggests that his constitutional rights to confront the State's witnesses [6] and to due process [7] are infringed by denying him post-testing access to the police barracks. We disagree. The right of confrontation does not carry with it an unlimited right to conduct discovery, particularly if that discovery is intrusive and lacks a reasonable justification. *See, e.g., Delaware v. Van Arsdall,* 475 *U.S.* 673, 679, 106 *S.Ct.* 1431, 1435, 89 *L.Ed.*2d 674, 683 (1986). We reject defendant's contention that the Confrontation Clause guarantees him a right of inspection of

---

[5] We recognize that police departments have not been required to film DWI defendants who are waiting to be tested on the Alcotest, but the absence of such a taping requirement does not automatically entitle a defendant to an inspection.

[6] The Sixth Amendment provides criminal defendants with the right "to be confronted with the witnesses" testifying against them. *U.S. Const.* amend. VI; *see also N.J. Const.,* art. I, ¶ 10. Included in this right is the right, subject to certain limitations, to cross-examine witnesses. *Pointer v. Texas,* 380 *U.S.* 400, 404, 85 *S.Ct.* 1065, 1068, 13 *L.Ed.*2d 923, 926 (1965); *State v. Cabbell,* 207 *N.J.* 311, 328, 24 *A.*3d 758 (2011).

[7] In *Brady v. Maryland,* 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196–97, 10 *L.Ed.*2d 215, 218 (1963), the United States Supreme Court construed the Fifth Amendment due process right, and held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See also State v. Mustaro,* 411 *N.J.Super.* 91, 101, 984 *A.*2d 450 (App.Div.2009).

the barracks here, based upon mere speculation that such an inspection might enable his counsel to cross-examine the police officer more effectively about the physical layout of the testing area and the officer's ability to have observed Baluski.

Nor do we find that the inspection is mandated by the due process principles expressed in *Brady.* To establish a *Brady* violation, a defendant must prove that (1) the prosecutor failed to disclose the evidence, (2) the evidence was of a favorable character to the defendant, and (3) the evidence was material. *Mustaro, supra,* 411 *N.J.Super.* at 101, 984 *A.*2d 450; *State v. Parsons,* 341 *N.J.Super.* 448, 454–55, 775 *A.*2d 576 (App.Div.2001). Evidence is "material" only if there is a "reasonable probability" that the disclosure of the evidence would have changed the result of the proceeding. *Mustaro, supra,* 411 *N.J.Super.* at 101, 984 *A.*2d 450. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Ibid.* The *Brady* rule is thus commonly invoked when information becomes known after trial which, at the time of trial, was known by the State but not the defendant. *State v. Marshall,* 123 *N.J.* 1, 199, 586 *A.*2d 85 (1991); *State v. Carter,* 91 *N.J.* 86, 111, 449 *A.*2d 1280 (1982) (quoting *United States v. Agurs,* 427 *U.S.* 97, 103, 96 *S.Ct.* 2392, 2397, 49 *L.Ed.*2d 342, 349 (1976)).

Baluski relies on *Giglio v. United States,* 405 *U.S.* 150, 154, 92 *S.Ct.* 763, 766, 31 *L.Ed.*2d 104, 108 (1972), a case applying the principles of *Brady,* for the proposition that when the credibility of a witness may be determinative of guilt, the nondisclosure of evidence that pertains to the witness's credibility falls within the *Brady* rule. The Court in *Giglio* further explained, however, that a *Brady* violation is not present "whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Ibid.* (internal quotation marks omitted). Rather, a finding of materiality is still necessary. *Ibid.*

Here, Baluski's own personal experience—having been in the testing room himself—undermines his contentions of a *Brady*

violation in being denied a pre-trial inspection of the room by his counsel or experts. Baluski was obviously in the room before and when he was being tested. Under normal circumstances he should know if he had been in a location where the officer could have observed him, and he should have had some awareness of the layout of the testing area. As we have already noted, Baluski has not come forward with a showing of proof explaining why he lacks such knowledge. Therefore, without some affirmative showing to the contrary, he cannot reasonably claim that there is material information known by the State which is unknown by him and which is being unfairly withheld from his counsel as a matter of due process.

To the extent that Baluski's invocation of the Fifth Amendment might be read as implicitly invoking his constitutional right against self-incrimination [8] under that provision, we conclude that this right also has not been infringed. The fact that Baluski and the Alcotest operator may have been the only persons in or near the testing area during the twenty-minute pre-testing period is of no moment. It is commonplace for a defendant and a police officer to be the only persons present during a particular interaction, such as during a street encounter, and there is no self-incrimination problem with the situational reality that a defendant may need to testify himself to gainsay the police officer's own narrative of events.

### III.

The respective orders authorizing the police station inspections in both *Carrero* and *Baluski* are reversed, and the cases are remanded for trial.

Reversed.

---

[8] *See Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966); *State v. Stas,* 212 *N.J.* 37, 51–59, 50 *A.*3d 632 (2012) (applying *Miranda* principles in a New Jersey municipal court proceeding).