NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2662-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEREMY ARRINGTON,

    Defendant-Appellant.

_____

> Argued October 8, 2024 – Decided December 20, 2024
>
> Before Judges Sabatino, Berdote Byrne, and Jacobs.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 16-03-0689 and 17-05-1346.
>
> Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).
>
> Frank J. Ducoat, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Essex County Prosecutor, attorney; Frank J. Ducoat, of counsel and on the brief).
>
> Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

SABATINO, P.J.A.D.

In adopting the present Criminal Code in 1978, our Legislature delineated the insanity defense to criminal charges using the following words:

> A person is not criminally responsible for conduct if at the time of such conduct he was <u>laboring under such a defect of reason, from disease of the mind</u> as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong.
>
> [N.J.S.A. 2C:4-1 (emphasis added).]

As expressed in these terms, the insanity statute codifies the common-law "M'Naghten" test dating back to nineteenth-century English law. The Legislature has not revised this definition of insanity since Title 2C's enactment nearly fifty years ago.

The primary legal issue in this appeal is whether criminal defendants in New Jersey invoking N.J.S.A. 2C:4-1 are permitted to testify at trial about their own allegedly insane mental state without accompanying expert testimony from a qualified mental health professional. We concur with the trial court that such lay testimony by a defendant, untethered to admissible expert opinion substantiating the defendant's "disease of the mind," is inadmissible under our Rules of Evidence and insufficient to advance an insanity defense under N.J.S.A. 2C:4-1. This conclusion is supported by the history and text of the

statute. It is also consistent with the case law of most of the states that have addressed the issue under the M'Naghten test.

Although policy arguments can be made and have been made to revise the criteria of N.J.S.A. 2C:4-1 and replace the traditional M'Naghten test with modern concepts of mental disorders, the Legislature has not done so. Nor has our Supreme Court invalidated the statute as unconstitutional or construed the law to allow lay testimony to suffice to establish a defendant's insanity. Consequently, we hold that defendants must have expert opinion testimony to meet their burden of proving the defense of insanity. We affirm the trial court's ruling that disallowed defendant in this case from testifying about his alleged insane state of mind without calling such an expert.

In the unpublished portion of this opinion, we reject defendant's other arguments for reversal of his convictions of multiple murders and other serious crimes, but remand for resentencing.

I.

The factual background of this case is gruesome and need not be recounted in detail here. Defendant Jeremy Arrington appeals from multiple convictions that stem from a November 5, 2016 incident in which he broke into a Newark apartment after seeing a Facebook post that made negative comments about him.

A-2662-21

Defendant proceeded to tie up and torture all, and kill some, of the inhabitants, most of whom were children, by stabbing and shooting them. The surviving victims all identified defendant as the person who committed these violent crimes.

The State charged defendant in a twenty-nine-count indictment with multiple murders, felony murder, attempted murder, aggravated assault, criminal restraint, weapons charges, and other related offenses that we need not enumerate in full here.

Before the jury trial, defense counsel argued his client was not competent to stand trial. The defense relied upon the written report and pretrial testimony of an expert psychologist who had examined defendant and deemed him incompetent to stand trial. The psychologist diagnosed defendant with a severe intellectual disability, alcohol and PCP use disorders, bipolar disorder, and possible schizophrenia spectrum disorder. The State countered with expert testimony of a psychiatrist who had examined defendant and reached an opposite conclusion. In essence, the State's expert opined that defendant was feigning incompetency. After a three-day competency hearing, a pretrial judge ruled in September 2019 that defendant was competent to stand trial.

A-2662-21

Defendant was unable to retain an expert to present opinion testimony to support his insanity defense at trial. His previous expert from the competency hearings was no longer practicing psychology and was therefore unavailable to testify. A second potential defense expert, a psychiatrist, was consulted, but apparently was unable to testify. No other expert was identified who would opine that defendant met the statutory test and the Public Defender's Office did not pay for a third mental health expert.

Given the circumstances, defendant never proffered a report from any mental health professional opining that he met the statutory definition of insanity. Instead, defendant sought at trial to testify as a lay witness about his mental state at the time when these homicidal and other criminal acts were committed. He did not seek to have any other lay witnesses testify to substantiate his alleged insanity.

Initially, the judge assigned to preside over the trial[1] ruled that defendant could present an insanity defense to the jury without a supporting expert. Subsequently, the judge reconsidered the question and concluded, as a matter of

---

[1] This trial judge succeeded the pretrial judge who had conducted the competency hearing.

A-2662-21

law, that the statute does not allow the insanity defense to get to a jury without expert opinion. Defendant's insanity defense was accordingly stricken.

The case proceeded to trial in February and March 2022. The State presented multiple fact witnesses, forensic and DNA evidence, and other extensive proofs of defendant's guilt. Defendant did not testify.

At the conclusion of the trial, the jury acquitted defendant of one count of attempted murder (count twenty-one) and convicted him on all other charges.

The trial court sentenced defendant on April 8, 2022, as follows:

- life imprisonment subject to an eighty-five percent parole bar pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2 ("NERA") on count one (murder), into which counts three, twenty-two and twenty-seven merged;

- twenty years with a ten-year period of parole ineligibility on count two;

- eighteen months on count four;

- life imprisonment on count five, into which counts six, twenty-three and twenty-eight merged, subject to NERA's eighty-five percent parole bar;

- life imprisonment on count seven, into which counts eight and twenty-nine merged, subject to NERA's eighty-five percent parole bar;

- fifty years with a thirty-year period of parole ineligibility on count ten, into which counts nine and eleven merged;

- fifty years with a thirty-year period of parole ineligibility on count

6

thirteen, into which counts twelve and fourteen merged;

- fifty years with a thirty-year period of parole ineligibility on count sixteen, into which counts fifteen and seventeen merged;

- eighteen months to be served without the possibility of parole on count eighteen;

- five years on count nineteen;

- eighteen months to be served without parole on count twenty;

- five years on count twenty-four;

- eighteen months on count twenty-five; and

- ten years on count twenty-six, subject to a NERA eighty-five percent parole bar.

All told, the court imposed an aggregate custodial term of 375 years with a 281-year parole disqualifier.[2]

On appeal, defendant makes the following points in his counseled brief:

POINT I

---

[2] The court also sentenced defendant based on two separate indictments on April 8, 2022, Indictment Nos. 16-03-689 and 16-02-382, both of which charged defendant with a variety of crimes. Defendant pled guilty to all of the charges in Indictment No. 16-02-382 and four of the eight counts in Indictment No. 16-03-689, and in exchange received a maximum sentence of seven years in a state prison with forty-two months of parole ineligibility to run concurrently with his sentence from Indictment No. 17-05-1346. Defendant's briefs do not expressly argue the convictions based on these guilty pleas are infirm.

A-2662-21

THE COURT IMPROPERLY DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHTS TO A DEFENSE AND TO TESTIFY.

POINT II

THE IMPROPER ADMISSION OF OTHER-CRIMES EVIDENCE WITHOUT ANY LIMITING INSTRUCTION REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS (NOT RAISED BELOW).

POINT III

DEFENDANT'S SENTENCE IS ILLEGAL.

Additionally, defendant makes the following arguments in his pro se supplemental brief[3]:

SUPPLEMENTAL POINT I

THE TRIAL COURT DEPRIVED APPELLANT OF HIS RIGHT TO A TRIAL BY AN IMPARTIAL JURY UNDER THE 6TH & 14TH U.S. CONSTITUTIONAL AMENDMENTS, AND ARTICLE I, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION.

SUPPLEMENTAL POINT II

THE TRIAL COURT DEPRIVED APPELLANT OF HIS RIGHT TO BE PRESENT THROUGHOUT ALL PORTIONS OF HIS TRIAL UNDER THE 6TH & 14TH U.S. CONSTITUTIONAL AMENDMENTS, AND ARTICLE 1, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION (NOT RAISED BELOW).

---

[3] We have slightly revised defendant's pro se points for grammatical reasons.

 A-2662-21

<u>SUPPLEMENTAL POINT III</u>

THE TRIAL COURT DEPRIVED APPELLANT OF HIS RIGHT TO COUNSEL UNDER THE 6TH & 14TH U.S. CONSTITUTIONAL AMENDMENTS, AND ARTICLE 1, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION (NOT RAISED BELOW).

II.

A.

For nearly two centuries, the insanity defense in many American jurisdictions has incorporated—or been adapted from—the test for legal insanity expressed by the English House of Lords in 1843. <u>See</u> <u>M'Naghten's Case</u>, 8 Eng. Rep. 718 (H.L. 1843). As Justice LaVecchia extensively traced the history in <u>State v. Singleton</u>, New Jersey courts "adopted the M'Naghten test shortly after it was introduced in England." 211 N.J. 157, 174 (2012) (citation omitted). Our courts have employed the M'Naghten test "consistently thereafter." <u>Ibid.</u>

"When the Legislature adopted N.J.S.A. 2C:4-1 in 1978, L. 1978, c. 95, it chose to preserve the M'Naghten test in spite of a recommendation from the New Jersey Criminal Law Commission to abandon it in favor of the Model Penal Code test." <u>Ibid.</u> (citing 2 Final Report of the New Jersey Criminal Law Revision Commission, commentary to N.J.S.A. 2C:4-1, at 96–97 (1971)).

9

As explained in Singleton, "[t]he M'Naghten test provides two distinct paths for a defendant to demonstrate that he was legally insane at the time he committed an act and therefore not criminally responsible for his conduct." Ibid. "First, a defendant can show that 'he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing.' N.J.S.A. 2C:4-1." Ibid. (emphasis added). "Second, even if the defendant did know the nature and quality of the act, he can still establish legal insanity if, because of a 'disease of the mind,' the defendant 'did not know what he was doing was wrong." Id. at 174–75 (emphasis added).

"In the century-and-a-half since the M'Naghten test was formulated, courts have recognized that the term 'wrong' in the second part of the test is susceptible of multiple interpretations." Id. at 175. In New Jersey, the concept of "wrong" has been held to embrace "notions of both legal and moral wrong." Id. at 177 (quoting State v. Worlock, 117 N.J. 596, 609–10 (1990)). In "the odd case in which a defendant is able to recognize that [defendant's] actions are legally wrong but is nonetheless incapable of understanding that they are morally wrong, [our Supreme Court has held that] 'the [trial] court should instruct the jury that "wrong" encompasses both legal and moral wrong.'" Ibid. (quoting Worlock, 117 N.J. at 611).

N.J.S.A. 2C:4-1 "adhere[s] to the general proposition that a defendant who has the mental capacity to know basic societal mores that distinguish objectively between right and wrong is legally responsible for his criminal conduct." Id. at 160. "Mental illness does not in and of itself eliminate moral blameworthiness under the test for criminal insanity enshrined in the Code of Criminal Justice." Ibid. "The insanity defense exists in criminal law not to identify the mentally ill, but rather to determine who among the mentally ill should be held criminally responsible for their conduct." Id. at 173 (quoting State v. Sikora, 44 N.J. 453, 470 (1965)).

"The insanity defense is not available to all who are mentally deficient or deranged; legal insanity has a different meaning." Cannel, New Jersey Criminal Code Annotated, cmt. 2 on N.J.S.A. 2C:4-1 (2024). Our courts have long held that "insanity is a defense to crime only when the diseased condition of mind was such that the defendant did not know the nature and quality of the act he was doing . . . ." State v. Maioni, 78 N.J.L. 339, 341 (E. & A. 1909). "Directed at the defendant's ability to 'know,' the M'Naghten test is essentially one of cognitive impairment. . . . [I]ts purpose is to determine whether the defendant had sufficient mental capacity to understand what he was doing when he committed the crime." Worlock, 117 N.J. at 603.

A-2662-21

"The insanity defense is 'an affirmative defense which must be proved by a preponderance of the evidence.'" State v. Gorthy, 226 N.J. 516, 533 (2016). This standard does not require a showing of the defendant's actual knowledge at the time of the offense, but rather focuses on the defendant's ability to "perceive the wrongfulness of his conduct." Worlock, 117 N.J. at 610. Thus, under the right and wrong dichotomy, "a defendant is excused from criminal liability if at the time of the commission of the offense, he or she lacked the capacity to distinguish right from wrong." Ibid.

B.

The precise question before us concerns the means by which a defendant in New Jersey may advance such an insanity defense at trial. Notably, before the present Title 2C insanity provision was enacted in 1978, the former version of the provision in Title 2A, N.J.S.A. 2A:163-2, required that the defense be supported by the sworn certificates of two psychiatrists "in appropriate cases." This difference under the previous statute was highlighted in State v. Whitlow, 45 N.J. 3, 12–13 (1965):

> In New Jersey the Legislature has provided statutory procedure for inquiry by the County Court or Superior Court to determine the sanity of a person in confinement under arrest or indictment for crime. N.J.S.[A.] 2A:163-2[]. The statute referred to contemplates institution of the proceedings by

12

presentation to the court of an application by the prosecutor or relatives or other interested persons, <u>supported by the certificates under oath of two physicians who have made examinations and who certify as to the accused's mental incapacity and need for commitment</u>. <u>See</u> N.J.S.A. 30:4-27 to [-]30. On receipt of such papers the court may conduct a hearing in open court, with or without a jury, and take the <u>testimony of qualified psychiatrists as to the mental competency of the accused to stand trial. In appropriate cases also, it may determine the sanity of the accused at the time of commission of the offense</u>.

[(Emphases added).]

In <u>Whitlow</u>, the relevant question before the Court was whether a criminal defendant's right against self-incrimination was violated if the trial court ordered that the defendant be examined by the State's psychiatrists for such an assessment of competency to stand trial. <u>Id.</u> at 10. The Court held that a trial court could mandate that a defendant attend and cooperate during such an examination by the State's psychiatrists. <u>Id.</u> at 29. Pertinent to this appeal, the Court stated in <u>Whitlow</u>:

When a defendant charged with crime pleads mental incapacity to stand trial <u>or innocence by reason of insanity, obviously expert medical opinion is necessary both for the defendant and for the State</u>. Although lay testimony as to insanity might be admissible, <u>it is unlikely in the extreme that exclusive reliance would ever be placed on it</u>. <u>In the usual situation</u> when counsel advises the State or the court of his client's mental incapacity for trial or for criminal

13                                                              A-2662-21

responsibility, <u>it may be assumed that defense psychiatrists have already examined defendant and furnished an expert opinion</u> supporting the statement.

[<u>Id.</u> at 10 (emphases added).]

In <u>State v. Scelfo</u>, 58 N.J. Super. 472, 477–79 (App. Div. 1959), another case tried under the Title 2A insanity provision, we held that the opinions of lay witnesses concerning a defendant's alleged insanity could be admissible. But we reached that holding in a context in which the defense had also presented testimony from two psychiatric experts. <u>Ibid.</u>

When the present version of the insanity provision was enacted in 1978, the Legislature eliminated Title 2A's procedural requirement for certifications by two examining psychiatrists. But in doing so, the Legislature maintained the general premise that a defendant would need to retain an expert to advance an insanity defense at trial.

The words used in N.J.S.A. 2C:4-1 signal the necessity of such a testifying expert. As we have noted, the statute requires the defendant to be "laboring under such defect of reason, from <u>disease</u> of the mind . . . ." N.J.S.A. 2C:4-1 (emphasis added). A "disease" commonly refers to "a condition of the living animal or plant body or of one of its parts that impairs normal functioning and

A-2662-21

is typically manfested by distinguishing signs and symptoms: SICKNESS, MALADY." Merriam-Webster's Collegiate Dictionary 358 (11th ed. 2020).

Black's Law Dictionary defines "disease" with similar diagnostic connotations:

> 1. A deviation from the healthy and normal functioning of the body <the drug could not be linked to his disease>. 2. (pl.) Special classes of pathological conditions with similar traits, such as having similar causes and affecting similar organs <respiratory diseases> <occupational diseases>. 3. Any disorder; any depraved condition.
>
> [Black's Law Dictionary 588 (12th ed. 2024).]

Meanwhile, Stedman's Medical Dictionary defines a "mental illness" as encompassing a variety of forms of "diseases":

> (1) a broadly inclusive term, generally denoting one or all of the following: 1) a disease of the brain, with predominant behavioral symptoms, as in paresis or acute alcoholism; 2) a disease of the "mind" or personality, evidenced by abnormal behavior, as in hysteria or schizophrenia; also called mental or emotional disease, disturbance, or disorder, or behavior disorder;
>
> (2) any psychiatric illness listed in Current Medical Information and Terminology of the American Medical Association or in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.
>
> [Stedman's Medical Dictionary 947 (28th ed. 2013).]

Furthermore, under our professional licensing standards in Title 45 and associated New Jersey regulations, laypersons generally are not qualified to make diagnoses of diseases, whether they be physical or mental.[4] It is unlawful for persons to engage in such professional practices without a license. See, e.g., N.J.S.A. 45:9-6 (prohibiting the practice of medicine or surgery without a license); N.J.S.A. 45:14B-5 (similarly prohibiting the unlicensed practice of psychology); N.J.S.A. 45:14BB-9 (likewise prohibiting the unlicensed practice of psychoanalysis).

We are mindful that, as our colleague discusses in his thoughtful concurring opinion, the phrase "disease of the mind" derived long ago from the M'Naghten test may be antiquated and worthy of a modern update. We are

---

[4] See, e.g., N.J.S.A. 45:9-5.1 (broadly defining "the phrase 'the practice of medicine or surgery' . . . [to] include the practice of any branch of medicine and/or surgery, and any method of treatment of human ailment, disease, pain, injury, deformity, mental or physical condition") (emphases added); N.J.S.A. 45:14B-2(b) (broadly defining "psychological services" to entail "the application of psychological principles and procedures in the assessment, counseling or psychotherapy of individuals for the purposes of promoting the optimal development of their potential or ameliorating their personality disturbances and maladjustments as manifested in personal and interpersonal situations") (emphases added); N.J.S.A. 45:14BB-3 (broadly defining "psychoanalytic services" as "therapeutic services that are based on an understanding of the unconscious and how unconscious processes affect the human mind as a whole, including actions, thoughts, perceptions and emotions") (emphases added).

equally mindful that the meanings of medical and psychological terms are not necessarily identical to their legal meanings. Even so, by retaining the term "disease of the mind" within N.J.S.A. 2C:4-1 as a predicate to an insanity defense, the statute contemplates that an expert mental health professional, not an amateur layperson, is needed to render such a diagnosis of a mental disease.

Our holding in this regard is buttressed by the structure of the Rules of Evidence. Those Rules divide opinion testimony into two categories: lay opinions admissible under N.J.R.E. 701 and expert opinions admissible under N.J.R.E. 702. N.J.R.E. 701 governs lay opinions of witnesses who are "not testifying as an expert." On the other hand, N.J.R.E. 702 prescribes that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
>
> [(Emphases added).]

The propriety of whether a lay witness may testify on a particular subject matter depends on the context, and whether that context inherently involves a topic that is "beyond the ken" of the average layperson. Jacobs v. Jersey Cent. Power & Light Co., 452 N.J. Super. 494, 505 (App. Div. 2017). "[E]xpert testimony is required when 'a subject is so esoteric that jurors of common

judgment and experience [without the benefit of such expert opinion] cannot form a valid conclusion.'" Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 450 (1993) (quoting Wyatt by Caldwell v. Wyatt, N.J. Super. 580, 591 (App. Div. 1987)); see also Ford Motor Credit Co., LLC v. Medola, 427 N.J. Super. 226, 239 (App. Div. 2012) (requiring a qualified expert to opine on esoteric issues involving a complex instrumentality to determine why car engine seized).

Here, the subject of whether a criminal defendant was "laboring under such a defect of reason, from disease of the mind" at the time of the charged offense is a complex subject—one that necessitates expert testimony by a psychiatrist, a psychologist, or some other duly qualified mental health professional. The assessment entails "scientific, technical, or other specialized knowledge." N.J.R.E. 702. Without guidance from such an expert to help them understand the processes of the human mind, jurors assessing a defendant's sanity could founder on the shoals of speculation and misunderstanding. In fact, the Model Criminal Jury Charge on the insanity defense implicitly presumes the jurors will have heard testimony from one or more experts on the defendant's mental condition. Model Jury Charges (Criminal), "Insanity (N.J.S.A. 2C:4-1)" (approved Oct. 1988) (referring, among other things, to "a conflict of medical testimony" that the jurors must resolve).

This is not to suggest that the disciplines of psychiatry and psychology are entirely objective and scientific. To be sure, there are plenty of instances in which such professionals will disagree, as exemplified by the competing expert opinions presented at defendant's own competency hearing.

Our core point is that there is no reason to believe the Legislature intended to allow the "disease of the mind" requirement under N.J.S.A. 2C:4-1 to be determined solely with lay testimony. We do not foreclose defendants offering lay evidence—including their own testimony if they waive self-incrimination rights—to provide facts that may inform the testifying experts' opinions and the jurors' knowledge of the record. For instance, laypersons with personal knowledge under N.J.R.E. 602 who know or have observed the defendant might recount peculiar behaviors they have witnessed. But where, as here, a defendant wants to take the stand and present an amateur self-diagnosis of mental illness without an expert, that is a bridge too far in the absence of a revision of the statute.

Defendant argues he has a Sixth Amendment entitlement to testify as he sees fit and tell the jury why he personally believes he was insane at the time of these atrocious crimes. No case in our state has ever constitutionally required such monologues. Nor has defendant identified any reported opinion from

 A-2662-21

another state utilizing the M'Naghten test that has recognized such a constitutional mandate. We are cognizant that at least a two states, Arizona and Ohio, have authorized defendants to present an insanity defense without expert testimony under the M'Naghten test, but those states have not been shown to represent the dominant view. State v. Bay, 722 P.2d 280, 284–85 (Ariz. 1986); State v. Reynolds, 550 N.E.2d 490, 496 (Ohio Ct. App. 1988) (reaching a similar conclusion adopting the Arizona court's approach in Bay).[5]

Most other states that have addressed the subject in M'Naghten jurisdictions have required expert testimony. For example, in People v. Moore, 117 Cal. Rptr. 2d 715, 723 (Ct. App. 2002), the California Court of Appeal observed that "[e]xpert medical testimony is necessary to establish a defendant suffered from a mental disease, mental defect, or mental disorder because jurors cannot make such a determination from common experience." See also Commonwealth v. Fortune, 302 A.3d 780, 787 (Pa. Super. Ct. 2023) (same); State v. Raine, 829 S.W.2d 506, 511 (Mo. Ct. App. 1992) (same); Doyle v. State,

---

[5] Our concurring colleague cites Georgia case law to support the assertion that expert testimony should not be required to raise an insanity defense, but Georgia's insanity standard is less rigorous than the M'Naghten test and requires the defendant show only a lack of "mental capacity to distinguish between right and wrong," without any requirement of proving "disease." Ga. Code Ann. § 16-3-2.

785 P.2d 317, 322–23 (Okla. Crim. App. 1989) (same). We regard the opinions of these other states to be the sounder approach.

C.

Applying these principles here, we affirm the trial court's exclusion of defendant's proposed lay testimony about his alleged insanity. There was no need for the court to conduct a Rule 104 admissibility hearing. The court appropriately exercised its role as a gatekeeper to bar the testimony. See State v. Olenowski, 253 N.J. 133, 154 (2023) (stressing the court's gatekeeping function in the admission of opinions about subject matters involving expert methodologies).

We close our discussion with a recognition that our role as an intermediary appellate tribunal is institutionally limited. State v. Carrero, 428 N.J. Super. 495, 511 (App. Div. 2012). We take no position on whether the reforms suggested by our colleague to modernize the M'Naghten standard should be adopted or whether any legislative change is warranted. In the absence of such direction by the Legislature or our Supreme Court, we conclude this defendant's conviction should not be rescinded based on such policy-laden possibilities.

A-2662-21

## III.

In this unpublished portion of our opinion, we very briefly address three other points defendant has raised.

First, we reject defendant's contention that he is entitled to a new trial because of a State witness's testimony at trial, in which she blurted out on cross-examination that defendant had allegedly sexually assaulted her mother. The comment emerged while defense counsel was asking questions about defendant's relationship with the witness's mother. Although the comment was potentially inadmissible evidence of a prior bad act under N.J.R.E. 404(b), no objection was made by defendant at the time. We discern no plain error, as it was not "clearly capable of producing an unjust result" in light of the State's copious proofs of the crimes charged. R. 2:10-2; State v. Clark, 251 N.J. 266, 286–87 (2022). Nor was there harmful error caused by the absence of a sua sponte limiting instruction to the jury.

We likewise detect no reversible error stemming from the court discharging one of the jurors who had left a voicemail with the court seeking to be excused from further service due to an unrelated upsetting experience she learned from a coworker. The court appropriately conferred with both counsel and listened to the voicemail, and neither of them objected to the juror's

22

discharge. The court did not abuse its discretion in declining to take additional questioning or steps suggested by defense counsel, given the juror's assurance she had not discussed the unrelated incident with other jurors. State v. R.D., 169 N.J. 551, 558–61 (2001) (noting the trial court's discretion in dealing with matters respecting the jury). It was not mandatory for defendant to have been present for this particular event, as his trial counsel ably asserted his interests in maintaining an impartial jury.

As to defendant's final point in his counseled brief, we concur that the matter should be remanded for resentencing, as both parties agree his sentence on the three attempted murder counts was illegal because it exceeded the limits of N.J.S.A. 2C:5-4(a) for attempted murder of less than five victims.

IV.

To the extent we have not discussed them, all other points raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed as to the convictions; remanded for resentencing.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23

A-2662-21

JACOBS, J.S.C., temporarily assigned, concurring.

I join in the outcome but depart from the majority holding insofar as it mandates expert testimony in all cases where a defendant elects to advance an insanity defense. It is my position that a defendant should not be categorically precluded from advancing an insanity defense in those rare instances where expert testimony is unsolicited or unavailable.

I.

The elements of the insanity defense manifest in a mosaic of approaches. In Kansas v. Kahler, 589 U.S. 271 (2020), the Supreme Court surveyed varying approaches to the defense nationwide, holding the Due Process Clause does not require a uniform standard for proving whether a defendant could "distinguish right from wrong" as articulated in the moral-incapacity prong of the M'Naghten test.[1] Indeed, the Court has declined to constitutionalize any particular version of the insanity defense, holding instead that a state's "insanity rule[ ] is substantially open to state choice." Clark v. Arizona, 548 U.S. 735, 752 (2006).

Just as the Supreme Court has tolerated an expansive approach to the insanity defense, our jurisprudence ought to allow a range of means to establish

---

[1] Of the states that have adopted the M'Naghten or Model Penal Code (MPC) tests, some interpret knowledge of wrongfulness to refer to moral wrong, whereas others hold it to mean a legal wrong. Kahler, 589 U.S. at 312; see N.J.S.A. 2C:4-1.

that defense.  In doing so, we should first acknowledge that not all complex questions require the aid of experts to be resolved.  As the bedrock of our justice system, jurors should be trusted to sort through mental processes which may otherwise be overly complicated by expert opinion and abstruse nomenclature. For example, it is not uncommon for mental health professionals to opine that a given defendant is malingering, defined in the Diagnostic and Statistical Manual of Mental Disorders "[a]s the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives . . . . "  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 836 (5th ed., text rev. 2022).[2]  Even so, an average juror may just as capably assess a defendant testifying in support of their own insanity defense without expert input to be "crazy like a fox."  In such an assessment,

---

[2] https://www.mredscircleoftrust.com/storage/app/media/DSM%205%20TR.pdf. Regarding this term, our Supreme Court observed in Rodriguez v. Wal-Mart Stores, Inc., "[a]lthough 'malingering' was removed from the index in the DSM-5, it remains a diagnostic code, and the criteria for its consideration remain unchanged."  237 N.J. 36, 60 (2019).  The Court went on to limit the use of the term, ruling that "the term 'malingering' raises heightened concerns since it may implicate credibility. Therefore, a medical expert's use of the term must be carefully scrutinized, applying an N.J.R.E. 403 balancing test, reviewed on appeal under an abuse of discretion standard."  Id. at 66.

jurors are no more or less likely to speculate or misunderstand than they are in regularly making a myriad of other difficult findings.

Permitting jurors to consider an insanity defense absent expert testimony is consistent with the recognized futility of reducing insanity to a fixed formulation, subject to definitive identification through clinical examination and expert exposition. In <u>Kahler</u>, Justice Kagan wrote of the defense's inherent fluidity:

> As the American Psychiatric Association once noted, "insanity is a matter of some uncertainty." Insanity Defense Work Group, Statement on the Insanity Defense, 140 <u>Am. J. Psych.</u> 681, 685 (1983). Across both time and place, doctors and scientists have held many competing ideas about mental illness. And that is only the half of it. Formulating an insanity defense also involves choosing among theories of moral and legal culpability, themselves the subject of recurrent controversy. At the juncture between those two spheres of conflict and change, small wonder there has not been [] stasis [] with one version of the insanity defense entrenched for hundreds of years.
>
> And it is not for the courts to insist on any single criterion going forward. We have made the point before, in <u>Leland</u>, <u>Powell,</u> and <u>Clark</u>. Just a brief reminder: "[F]ormulating a constitutional rule would reduce, if not eliminate, [the States'] fruitful experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold." Or again: In a sphere of "flux and disagreement," with "fodder for reasonable debate about what the cognate legal and medical tests should

3

be," due process imposes no one view of legal insanity. Defining the precise relationship between criminal culpability and mental illness involves examining the workings of the brain, the purposes of the criminal law, the ideas of free will and responsibility. It is a project demanding hard choices among values, in a context replete with uncertainty, even at a single moment in time. And it is a project, if any is, that should be open to revision over time, as new medical knowledge emerges and as legal and moral norms evolve. Which is all to say that it is a project for state governance, not constitutional law.

[Kahler, 589 U.S. at 296 (citing Leland v. Oregon, 343 U.S. 790, 798 (1952); Powell v. Texas, 392 U.S. 514, 536-37 (1968); Clark, 548 U.S. at 752-53).]

New Jersey Chief Justice Weintraub also recognized the futility in diagnosing a fixed disease or defect of the mind:

What is a disease or defect of the mind? What, in terms appropriate to criminal responsibility, differentiates the functional aberration called a disease or defect of the mind from what is inscrutably called a defect of character? However helpful such classifications may be in the approach to the treatment of the sick, I cannot find in them a pivotal fact upon which criminal liability would depend, a key fact to which the trial and the jury's consideration could be addressed. I suspect that if psychiatrists were asked to fix a line, most would resort to an ethical or social concept, the truth of which they could not expertly demonstrate.

[State v. Lucas, 30 N.J. 37, 76 (1959) (Weintraub, C.J. concurring).]

4

In this context, we bear in mind the origin of the M'Naghten rule, unchanged in New Jersey since its adoption in 1846, ten years before the birth of Sigmund Freud.  Id. at 66 (referencing State v. Spencer, 21 N.J.L. 196 (Oyer and Terminer 1846)).  This test was applied by jurors decades before the advent of psychiatric expertise.  It may yet be applied without need for such expertise.

Permitting a defendant to testify absent an expert intervenor has the added benefit of allowing jurors to directly observe a defendant's demeanor.  Such an experience is often foreclosed in what has developed in the modern era to be a "battle of the experts," where jurors hear nothing more than competing assessments of how a defendant purportedly behaved at the time of an alleged crime or subsequent evaluation, and whether they should be considered not guilty by reason of insanity.

Before the development of forensic psychiatry, assessing a person's sanity was squarely within the realm of common experience, illuminated through literature, among other cultural and artistic expression.  In Hamlet, readers can discern for themselves whether Ophelia's madness is genuine or Hamlet's is feigned.[3]  Likewise, the rub of this case lies in discerning a subject's true state

_____

[3] WILLIAM SHAKESPEARE, HAMLET act 2, sc. 2, l. 223-24.  See, e.g., Tenney L. Davis, The Sanity of Hamlet, 18 J. Phil., 629, 630-33 (1921); Stacey Anne

of mind; whether he knew the nature and quality of his acts, and if he did, whether he knew what he was doing was wrong. Resolving this inquiry lies peculiarly and ultimately within human comprehension, unaided by expert scrutiny when circumstances dictate.

Since Shakespeare, descriptions of insanity have evolved. We no longer refer to mental illness as states of "fury," "delirium," or "melancholia."[4] Such terms, while still within our lexicon, would be anachronistic in describing psychiatric illnesses like bipolar disorder or schizophrenia. Similarly, since inception of the M'Naghten test, its operative phrase – "disease of the mind" – has become anachronistic. But while descriptions and definitions have become outmoded, the concept of insanity remains sufficiently comprehensible for jurors to have the capacity to know it when they see it.

II.

---

Stewart, Though This Be Madness, Yet There Is Method in't: Madness, Melancholy, and Mirth in the Acting of Hamlet (1997) (M.A. thesis, The Ohio State University) (OhioLINK).

[4] Carolyn Darr et al., A Timeline of Words Used to Describe Mental Illness, in Divinest Sense: Madness in 18th Century England (2013), https://websites.umich.edu/~ece/student_projects/madness/terminology.html.

A-2662-21

As the majority recounts, two mental health professionals examined defendant and testified as to his competency to proceed in May 2019, approximately twenty months before trial began in February 2022. Dr. Chester Sigafoos, a psychologist, testified that defendant was not competent to stand trial, diagnosing him with severe mental retardation, alcohol use disorder, PCP use disorder, bipolar disorder, and possible schizophrenia spectrum disorder. The State called a psychiatrist, Dr. Douglas Smith, who testified defendant was competent to stand trial.

In September 2019, the trial court rendered a decision, finding Dr. Sigafoos's testimony less than credible and concluding defendant was competent to stand trial. Immediately after the court rendered its ruling, defense counsel informed the court that Dr. Sigafoos was no longer practicing psychology. The defense also hired a psychiatrist to examine defendant but that psychiatrist was not available to testify. The Public Defender's Office refused to pay for a third mental health professional.

At this point, the trial record highlights defense counsel's procedural conundrum:

> THE COURT: I under – I understand these are very
> serious charges and I'm not particularly happy about a
> request for adjournment, but – but I understand these
> are very serious charges and to try to force you when

you're building a record such as this would be very difficult.

. . . .

I think I would strongly encourage you to reach out to Dr. Sigafoos and see if he would -- see if he was able to testify remotely, if that's a possibility. And if it's not a possibility, then I think you either have to forgo insanity or I would, perhaps -- I hate to do it, but I would, perhaps, maybe, allow you to quickly see if you could come up with another doctor. But I don't think you really have expressed an interest in doing that, right?

DEFENSE COUNSEL: Judge, I don't have the ability to do it given the framework that I'm operating under.

THE COURT: Okay. All right. Then I guess you're just not going to be able to argue insanity, that's all. It'll be, well, general denial or something[.]

Instead, defense counsel switched tactics, notifying the court that notwithstanding the absence of a mental health expert, defendant intended to advance an insanity defense. In substance, the proffer consisted of the facts of the case itself. As surmised by the court, defendant's tactic was to highlight the gruesomeness of the crimes, such that "the more prejudicial [the details,] the better [the defense]."

Subsequently, the court ruled defendant could not advance an insanity defense on that basis alone:

THE COURT: I don't see how you can have an insanity case without a doctor or an expert coming into court to testify as to Mr. Arrington's state of mind. . . [U]pon further reflection from the last time we were in court, I -- even if you were to have Mr. Arrington testify, I don't know that he would be qualified to testify as to his own state of mind as far as . . . whether or not he would qualify, you know -- that he did not understand -- appreciate the consequences of his behavior, and that he -- he's really not qualified to give an opinion about whether or not he was insane or not at the time of the offense. So, without a doctor to . . . come in to do that, I don't see how you'll -- you -- and I wouldn't allow you to even bring insanity into the case.

Defense counsel argued the court was taking a different position than it had previously, now disallowing defendant to testify unless he also had an expert testify.

DEFENSE COUNSEL: Now you're saying I need a medical expert, or else I can't have insanity.

THE COURT: I -- I -- I think you're right . . . because I've been struggling -- candidly, I've -- and -- I've -- I've been struggling with the notion that ever since you said you weren't going to be seeking another doctor, I was struggling with how you might be able to establish . . . the affirmative defense. And, you know, from our last conversation in court . . . I did indicate . . . you've got to have some evidence. You've got to have some witness to come in. And I -- and I probably did say at least the defendant taking the stand to say . . . he was, you know, out of his mind or whatever he -- he might say. But I don't -- but upon further reflection, and looking over the charge and looking over the, you

9

know, the law, I don't see how he, Mr. Arrington, could be qualified to make such an assessment of his own mental capacity . . . I think you have to have someone else come in, like a -- someone who's qualified, a doctor, to be able to testify and give his . . . or her opinion on Mr. Arrington's state of mind.

COUNSEL:   Okay, Judge, if that's the [c]ourt's position now, but . . . Mr. Arrington's testimony would be other evidence, that I had the – belie[f] that the jury could rely on the evidence as testified to by State witnesses to come to the conclusion that the defendant did not know what he was doing was wrong.  So, Your Honor's placing an increased burden, I think, on the defense and actually gutting the portion of the charge and the definition of what is insanity by requiring that we have an expert.

COURT:  Well, I don't think I'm changing.  I -- I think I made it very clear last time we were in court.  That's part of the reason why I didn't allow . . . any voir dire questions to the jury about insanity because it didn't seem like . . . you were going to be able to establish any insanity defense.  And therefore, it would be out of the – out of the case.  And that's why I -- that's why your voir dire questions you proposed, many of which had to do with insanity, I said no based on the representations that you had indicated.

COUNSEL:  Judge, . . . your ruling before -- and I realize you said you'd reconsidered, but that your ruling before was that as long as any witness took the stand, including the defendant, that the defense of insanity could still be given to the jury.  But now your position is it has to be a medical doctor and someone qualified and the -- it's really, as I indicated, guts the jury's ability to listen to the other testimony and . . . to lay testimony to come to the conclusion that the

10

defendant did not know the difference between right and wrong, that he's proven that by a preponderance of the evidence.

Rather than summarily preclude defendant from pursuing an insanity defense, the better course was for the court to conduct a Rule 104 hearing.

> Before a jury issue can arise with respect to the existence of a mental disease or defect, and the absence of the requisite state of mind as a result thereof, a defendant must come forward with competent, reliable evidence about the existence of such a disease or defect which a reasonable juror could credit.
>
> [State v. Murray, 240 N.J. Super. 378, 399 (App. Div. 1990) (citing Humanik v. Beyer, 871 F.2d 432, 443 (3d Cir. 1989); State v. Juinta, 224 N.J. Super. 711, 724 (App. Div. 1988)).]

Even without a Rule 104 hearing, however, it is clear from the competency hearing that defendant could not adduce the quantum of reliable evidence necessary to have an insanity defense entertained by a jury. At the conclusion of the competency hearing, the trial court made its findings, noting it "ha[d] great concerns with the credibility of Dr. Sigafoos" and determined defendant competent to stand trial. In reaching its conclusion, the trial court found there was "a very persuasive reason to show that the defendant was feigning incompetence." Among the instances leading to this finding was defendant's full familiarity with Miranda rights and their meaning, as well as defendant's

11

insistence to "sell" his version of events to police during a two-hour interrogation in which he said, "the children were stabbing each other" and "never admitted shooting the one victim in the head [and] claimed that one of the other children had done it." The trial court noted too that defendant had "normal interactions with staff and other inmates or patients" but that "there was an abrupt change when the defendant spoke with the clinical staff," where he either remained mute or "at other times spoke in [a] short, soft tone, with short answers . . . g[iving] simplistic phrases to some of the questions." The trial court also observed:

> [D]efendant told a mental health counselor [in a note] that he was faking [] mental illness so it would be in his records when he goes to [c]ourt. In that same note, there was a reference made that Mr. Arrington was also reading law books at the time, which again is contrary to what Dr. Sigafoos said regarding his mental IQ.

The trial court's finding that defendant was feigning mental illness satisfies the standard that the Ninth Circuit applies when faced with the question of whether lay testimony alone can ever support a finding of insanity. [5] In United

---

[5] States differ in their rules governing the necessity of expert testimony to prove an insanity defense. At present, New Jersey follows the M'Naghten rule, and the majority holds that expert testimony is mandated. In contrast, the Georgia Supreme Court has explicitly held expert testimony is not necessary to support an insanity defense under its more lenient standard. Perez v. State, 281 Ga. 175,

<u>States v. Keen</u>, defendant appealed his convictions for bank robbery, contending he had been wrongfully prevented from raising an insanity defense resting solely on his own testimony and that of his family members. 104 F.3d 1111 (9th Cir. 1996). "Without reaching the question of whether lay opinion alone can ever support a finding of insanity," the Circuit Court upheld the trial court's decision to preclude defendant from going forward because "[a] review of the statements made by Keen's counsel reveal[ed] that the proffered evidence of insanity was statutorily insufficient." <u>Id.</u> at 1117. In so concluding, the <u>Keen</u> court applied a standard I urge we adopt:

> whether there is present a sufficient quantum of evidence to justify a jury instruction on the insanity defense: "[w]here the issue of insanity has otherwise been properly raised, a federal criminal defendant is due a jury instruction on insanity when the evidence would allow a reasonable jury to find that insanity has been shown <u>with convincing clarity</u> . . . ."
>
> [<u>Id.</u> at 1116-17 (emphasis added) (citing <u>United States v. Whitehead</u>, 896 F.2d 432, 435 (9th Cir. 1990)) (quoting <u>United States v. Owens</u>, 854 F.2d 432, 435 (11th Cir. 1988)).]

176 (2006) ("[A]n insanity defense does not require the expert testimony of a psychologist or psychiatrist."); <u>see</u> Ga. Code § 16-3-2 ("A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence.").

Though imperfect in approach, a like outcome was warranted here, where the quantum of evidence proffered would not have allowed a reasonable jury to find defendant insane under M'Naghten. Concurring in the result reached, I note that

> [t]he proper and rational standard [for the review of claimed trial errors] is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one."
>
> [State v. R.B., 183 N.J. 308, 333-34 (2005) (quoting Lutwak v. U.S., 344 U.S. 604, 619 (1953)).]

Finally, I observe that the right to present a viable defense is central to our jurisprudence, but it is not inviolable. This court has held that a defendant may be precluded from raising an insanity defense where he fails to provide the state notice of that affirmative defense under Rule 3:12. In State v. Burnett, 198 N.J. Super. 53, 58 (App. Div. 1984), we recognized:

> Our Constitution "does not protect a defendant from the consequences of the defense he makes, nor assure him a right so to defend as to deny the State a chance to check the truth of his position." Given the ease with which the defenses of insanity and diminished capacity can be fabricated, the State's interest in protecting itself against "an eleventh-hour" claim is both obvious and legitimate.

14

[(citations omitted)].

Here, defendant attempted to advance an insanity defense without expert support. The trial court precluded its pursuit for sound reasons. In the end, I concur in the outcome, concluding that the trial court's ruling was not clearly capable of producing an unjust result. R. 2:10-2.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION